[No. C011672. Third Dist. May 29, 1992.]

In re JOHNNY ARAFILES on Habeas Corpus.

## Counsel

Riordan & Rosenthal, Dennis P. Riordan, Michael Satris, Margaret Littlefield and Steven Fama for Petitioner.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Morris Lenk and Paul D. Gifford, Deputy Attorneys General, for Respondent.

## OPINION

PUGLIA, P. J.—Article V, section 8, of the California Constitution was amended in 1988 to add subdivision (b) to allow the Governor a 30-day period to review and to "affirm, modify or reverse" any decision of the Board of Prison Terms "with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder . . . ." Petitioner, Johnny Arafiles, is serving an indeterminate term of life imprisonment for a conviction of first degree murder committed on October 13, 1977. The Board of Prison Terms (BPT) granted petitioner parole, but the Governor, acting pursuant to article V, section 8, subdivision (b) (section 8(b)), reviewed and reversed that decision. The principal issue presented in this habeas corpus proceeding is whether the application of section 8(b) to a prisoner who committed his crime before its enactment violates the ex post facto clauses of the state or federal Constitutions. After first considering petitioner's other contentions, we shall conclude it does not. Petitioner's other contentions are that (1) the Governor's review of the parole release decision was not timely; (2) the Governor improperly considered evidence outside the record; and (3) section 8(b) and its enabling legislation (Pen. Code, § 3041.2) deny him procedural due process. Finding no merit in any of petitioner's contentions, we shall deny the petition.

In February 1984 the BPT first considered petitioner's suitability for parole. Parole was denied, with the BPT listing four factors supporting denial: (1) the heinous manner of the crime, which BPT characterized as an "execution-style murder"; (2) petitioner's history of violence; (3) petitioner's prison disciplinary record; and (4) psychiatric evaluations which did not support parole release. At subsequent parole suitability hearings in 1986, 1988, and 1989, the BPT again found petitioner unsuitable for parole.

On March 7, 1991, the BPT held a fifth parole suitability hearing. At the conclusion of the hearing, the BPT hearing panel decided to release petitioner on parole. The hearing panel found petitioner had committed his crime as a result of "significant stress" in his life. The hearing panel was also impressed with the remorse shown by petitioner at the hearing. Other factors cited by the hearing panel which weighed in favor of parole included petitioner's participation in prison programs, his maturation, and maintenance of his family ties.

After concluding petitioner should be released on parole, the hearing panel computed his term of imprisonment. (See Cal. Code Regs., tit. 15, §§ 2282, 2289.) The panel imposed a total term of 184 months and awarded petitioner

32 months of postconviction credits, reducing his term to 152 months. (See Cal. Code Regs., tit. 15, § 2290.) Since petitioner had already served more than 152 months, the hearing panel recommended he be released immediately to parole. (See Cal. Code Regs., tit. 15, § 2289.) The panel specified its decision would be effective in 60 days, i.e., on May 6, 1991.

BPT regulations provide the hearing panel's parole release decision is provisional and subject to review by the BPT's decision review unit. (Cal. Code Regs., tit. 15, § 2041, subd. (a).) The decision review unit referred the hearing panel's decision to the BPT's chief deputy commissioner (see Cal. Code Regs., tit. 15, § 2041, subd. (d)(2)), who in turn referred it to a review committee consisting of three BPT commissioners. (Cal. Code Regs., tit. 15, § 2041, subds. (d)(2), (h).)

On April 9, 1991, the decision review unit modified the hearing panel's parole release decision and affirmed the decision as modified. As modified the decision provided that petitioner be released on parole upon the completion of all administrative reviews of the decision. (See Cal. Code Regs., tit. 15, §§ 2289, 2359, subd. (b).) The hearing review unit gave its decision an effective date of April 18, 1991.

Thereafter, Governor Pete Wilson exercised the review power granted by section 8(b) and its implementing statute, Penal Code section 3041.2, and reversed the decision granting petitioner parole. The Governor determined petitioner was unsuitable for parole, citing several factors in support of his decision, including the manner in which the crime was committed, the motive for the crime, and petitioner's lengthy criminal record. The Governor found no evidence in the record to support the hearing panel's finding that "significant stress in [petitioner's] life" prompted the commission of the murder. Finally, the Governor deemed petitioner's expression of remorse before the hearing panel entitled to little weight because other information in the record indicated petitioner refused to accept full responsibility for the murder.

I

Petitioner argues the Governor's reversal of the decision to grant him parole is ineffective because he failed timely to act within the 30-day period specified in section 8(b) and Penal Code section 3041.2. Petitioner was granted parole by a hearing panel of the BPT on March 7, 1991. Petitioner claims the Governor had 30 days from March 7, 1991, in which to exercise his discretion to affirm, modify or reverse the decision. The record shows, however, that the Governor acted no earlier than May 18, 1991, the

date stamped on his order reversing the parole decision, and no later than May 29 when the Governor sent written notice to petitioner of his decision reversing the grant of parole.

Section 8(b) provides "[n]o decision of the parole authority . . . with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute."[1]

The issue here turns upon when the 30-day period within which the Governor may act commences. Section 2043, title 15, of the California Code of Regulations states in relevant part: "Any proposed decision granting, modifying or denying a parole date for a life prisoner, whose commitment offense occurred after July 1, 1977 . . . shall be effective 60 days after the hearing at which the proposed decision was made, unless the proposed decision states a later effective date."[2]

This regulation is applicable to petitioner's case because his commitment offense occurred in October 1977. At the March 7, 1991, hearing at which the hearing panel granted petitioner parole, the panel stated its decision would be effective in 60 days, i.e., May 6, 1991.

We conclude the Governor's authority to review a parole decision commences on the effective date of the BPT's decision. The Governor therefore had 30 days commencing on May 6, 1991, in which to review and act upon the parole decision. Because the record shows the Governor acted no later than May 29, 1991, the Governor's action was timely.

---

[1]Section 8(b) provides in full: "(b) No decision of the parole authority of this State with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute. The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider. The Governor shall report to the Legislature each parole decision affirmed, modified, or reversed, stating the pertinent facts and reasons for the action."

Penal Code section 3041.2 states: "During the 30 days following the granting, denial, revocation, or suspension by a parole authority of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the authority's decision pursuant to subdivision (b) of Section 8 of Article V of the Constitution, shall review materials provided by the parole authority.

"(b) If the Governor decides to reverse or modify a parole decision of a parole authority pursuant to subdivision (b) of Section 8 of Article V of the Constitution, he or she shall send a written statement to the inmate specifying the reasons for his or her decision."

[2]This regulation is consistent with Penal Code section 3042, subdivision (b), which provides that no life prisoner "shall actually be released on parole prior to 60 days from the date of the hearing" at which parole is granted.

Petitioner's interpretation of the time provision in section 8(b) is untenable. Petitioner suggests the Governor must act within 30 days of the hearing panel's decision. Yet, Penal Code section 3042, subdivision (b), directs the BPT to record all such hearings and transcribe them within 30 days. Petitioner's proposed interpretation would require the Governor to make his decision in many if not most cases without the benefit of a transcript of the proceedings before the hearing panel, and would render it difficult if not impossible to review the BPT decision because the Governor would not have access to all the evidence before the BPT.

In construing a statute, a court "should ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) The construction proposed by petitioner is "repugnant to the general purview" of the statute (*Tiernan* v. *Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 219 [188 Cal.Rptr. 115, 655 P.2d 317]) and would lead to absurd consequences. Such a construction must be avoided (*In re O'Neil* (1977) 74 Cal.App.3d 120, 123 [141 Cal.Rptr. 338]) and by rejecting petitioner's formulation we do so avoid it here.[3]

## II

Petitioner argues the Governor's decision to reverse the order granting parole is invalid because in making his decision the Governor relied on materials not before the hearing panel. Petitioner claims the Governor's decision was based at least in part on a letter from the San Joaquin County District Attorney objecting to the decision granting petitioner parole and urging the Governor to reverse that decision.

After the BPT's decision review unit affirmed the hearing panel's parole decision, the San Joaquin County District Attorney wrote the Governor and urged him to reverse the decision. The district attorney's letter contained a detailed statement of the facts of petitioner's crime including the motive for the crime and petitioner's prior criminal record. The letter stated: "There

---

[3]The BPT's decision review unit, following its approval of the hearing panel's grant of parole, gave its own decision an effective date of April 18, 1991. That does not alter our determination that the effective date for purposes of commencement of the 30-day period for gubernatorial review was May 6, 1991. Decisions approved by the decision review unit are to be assigned an effective date only "if one is not otherwise provided[.]" (Cal. Code Regs., tit. 15, § 2041, subd. (c).) As noted, an effective date for parole decisions affecting life prisoners is otherwise provided in section 2043, title 15, of the California Code of Regulations, which states "[a]ny proposed decision granting . . . a parole date for a life prisoner . . . shall be effective 60 days after the proposed hearing at which the proposed decision was made . . . ." In purporting to fix an effective date less than 60 days after the parole decision was made, the decision review unit acted contrary to its own rules (Cal. Code Regs., tit. 15, § 2043).

should be no question that [petitioner] needs to be punished for his crime and a mere 15 years for FIRST DEGREE MURDER is not punishment. [The decision to grant petitioner parole] is a cruel joke on the entire judicial system." (Emphasis in original.) The district attorney requested the Governor "reverse said decision pursuant to the power vested in [him] by Penal Code Section 3041.2."

Among the reasons urged in the district attorney's letter for reversing the parole decision was the lack of remorse expressed by petitioner: "[Petitioner's] entire attitude toward the murder he committed was demonstrated clearly by the version of the killing he gave to Mr. C. Lowery, Correctional Counselor I, who interviewed him prior to the [hearing panel's] March 7, 1991, hearing. [Petitioner] told Mr. Lowery that he and the victim had a quarrel, both had knives, and [petitioner] was lucky not to have been the one who got stabbed. [Petitioner's] story is a monstrous fabrication that indicates [he] is not close to being ready for release."

Approximately three weeks following his receipt of the district attorney's letter, the Governor issued his order reversing the decision granting petitioner parole. Among the reasons given by the Governor in his order was the following: "5. Insufficient Remorse—The transcript of the hearing indicates [petitioner] 'felt kind of bad' about killing [the victim]. Apparently [petitioner] had grown up with him and knew his family. Psychiatric reports also indicate a stated remorse for the death and some insight into the lifestyle leading up to the murder. However, contradictory statements made to a prison counselor [Correctional Counsellor Lowery] prior to the parole hearing reflect a contrary attitude. . . . [¶] [T]he record in this case requires a rejection of the . . . finding of remorse. . . . [T]he Governor finds that the most recent expressions of regret at the death of [the victim] are undercut by the apparent lack of full acceptance of responsibility for the murder."

Petitioner makes a twofold argument with respect to the district attorney's letter and the Governor's alleged consideration of and reliance upon it. Petitioner first claims the recitations set forth by the Governor in his order—specifically, that petitioner made statements to a prison counselor demonstrating a lack of remorse and refusal to accept full responsibility for his crime—are untrue. Second, petitioner asserts it was improper for the Governor to consider a letter that was not part of the administrative record and which petitioner was not afforded notice of nor given an opportunity to respond.

■ Petitioner denies he made any comments to the prison counselor suggesting a lack of remorse or refusal to accept responsibility for his crime.

Thus he contends the Governor's order is not supported by substantial evidence. This contention is easily dismissed because petitioner has not provided this court with an adequate record to evaluate this claim. The transcript of the proceedings before the hearing panel shows the prison counselor's report was a part of the administrative record and petitioner makes no claim otherwise. For whatever reason, petitioner elected to provide this court only with a part of the administrative record, and among the materials omitted was the counselor's report. In the absence of an adequate record, we presume the record contains substantial evidence in support of the Governor's order. (See generally 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 418, pp. 415-416.)

■ Petitioner asserts the Governor's order is void because in making that order the Governor "relied upon" the district attorney's letter instead of confining his review solely to the administrative record of proceedings before the hearing panel. This contention implicates the scope of gubernatorial review.

■ Section 8(b) states "The Governor may review the [parole] decision." Penal Code section 3041.2 states that "when reviewing" the decision of the parole authority, the Governor "shall review materials provided by the parole authority." Although neither section 8(b) nor Penal Code section 3041.2 expressly states the Governor's review is limited to a consideration of the record before the hearing panel, such a limitation is implicitly conveyed by the common meaning of the term "review," particularly when that term is used as here, in juxtaposition to an express reference in the statute to materials provided for the Governor's review by the parole authority. In its usual construction, " 'review indicates simply a re-examination of proceedings already had' without the taking of any new evidence" (*State* v. *Hanson* (1957) 274 Wis. 423 [80 N.W.2d 387, 391]; i.e., an examination of the same record by a different tribunal. (See *Department of Public Safety* v. *MacLafferty* (1973) 230 Ga. 22 [195 S.E.2d 748, 751]; *Union Oil Co. of Cal.* v. *State Dept. of Nat. Resources* (Alaska 1974) 526 P.2d 1357, 1363, fn. 9.) Thus in *In re Shattuck* (1929) 208 Cal. 6 [279 P. 998], the court considered a provision of the State Bar Act allowing an attorney who has been disbarred or suspended to petition for "review" of that decision by the Supreme Court. That court held the "review" contemplated by the act consisted of a re-examination of the entire record of the proceedings before the administrative tribunal. (208 Cal. at pp. 8-9.)

The Governor's review must satisfy minimum due process requirements. (See *In re Sturm* (1974) 11 Cal.3d 258, 265-266 [113 Cal.Rptr. 361, 521 P.2d 97].) The authority under which the Governor conducts his review is reasonably susceptible to an interpretation which would avoid doubts as to its facial

compliance with that constitutional mandate. Accordingly, we conclude the "review" authorized by by section 8(b) and Penal Code section 3041.2 is confined to a reexamination and consideration of the administrative record before the BPT. (See *Association for Retarded Citizens* v. *Department of Developmental Services* (1985) 38 Cal.3d 384, 394 [211 Cal.Rptr. 758, 696 P.2d 150].)

■ There is nothing in the record before us to suggest the Governor failed to confine his review to the administrative record that was before the hearing panel. To the contrary, in his order the Governor stated his decision was based on "a full and careful review of the record" and that he considered "the same factors which the parole authority was required to consider . . . ." ■ A habeas proceeding is in the nature of a collateral attack " 'and [an order] that is collaterally attacked carries with it a presumption of regularity.' " (*In re Martha* (1954) 122 Cal.App.2d 654, 658 [265 P.2d 527].) ■ In their return the People point to the lack of any evidence suggesting the Governor was either unaware of the limited scope of his review or that he failed so to confine that review. In the absence of any such evidence, we must presume the Governor properly performed his review function within the constitutional and statutory framework. (See Evid. Code, § 664.)

In his traverse, petitioner simply reiterates the allegations in the petition; i.e., the Governor must have "relied upon" the district attorney's letter because the Governor's order used language similar to that contained in the letter. That conclusion does not necessarily follow. That the Governor's order contained language similar to that set forth in the district attorney's letter does not necessarily establish the Governor's decision was based on matters outside the record. It does not appear there was anything in the district attorney's letter that was not before the hearing panel and thus outside the administrative record. As long as the content of the district attorney's letter ostensibly relied upon by the Governor was included in the administrative record, petitioner can have no cause for complaint.

The only way to determine whether the Governor confined his review to the administrative record is to examine that record. The only part of the district attorney's letter which petitioner claims was improperly relied upon by the Governor concerned statements petitioner purportedly made to a prison counselor. As we have noted, the report of that prison counselor was a part of the administrative record before the hearing panel. Petitioner has elected not to make that report a part of the record before this court. Thus we reject his claim of impropriety.

Petitioner argues the Governor's consideration of the district attorney's letter violates his right to due process in that he was not afforded notice of

and an opportunity to respond to it. The gist of this claim appears to be that it is improper for the Governor even to read letters from interested members of the public concerning the Governor's power to review parole decisions, at least where the Governor ultimately exercises his power of review. Yet petitioner does not cite any authority that would forbid the Governor from considering public comment with regard to whether he should exercise his discretion to review a parole decision.

Neither section 8(b) nor Penal Code section 3041.2 says anything about what the Governor may consider in deciding whether to exercise his discretionary power to review a parole decision. The reason for the lack of any such direction is obvious: the Governor's exercise of the power to review parole decisions is entirely discretionary. Because the Governor need not review all such decisions, interested members of the public will necessarily play a role in informing the Governor's discretion whether to review a particular parole decision. And the same right of access to the Governor utilized by the district attorney here may be exercised to urge reversal of a decision unfavorable to a prisoner. Thus, if the hearing panel had denied parole, petitioner, his family, and interested members of the public would be entitled to urge the Governor to review and reverse that decision. We see no reason why the interested public may not "provide the [Governor] with food for thought . . . without devouring the inmate's constitutional rights." (Fn. omitted, *In re Fain* (1983) 139 Cal.App.3d 295, 304 [188 Cal.Rptr. 653].)

However, as we have noted, the Governor's review itself, as distinguished from his decision to review, is limited to the administrative record and his decision must be based on the same factors which the hearing panel must consider in arriving at its parole decision. Petitioner was not denied due process by the Governor's consideration of the district attorney's letter in deciding whether to review the grant of parole to petitioner.

### III

Petitioner contends the Governor's review and reversal of the parole release decision denied him procedural due process. At his hearing before the hearing panel of the BPT, petitioner was given notice and an opportunity to be heard, including the right to be present at the hearing, to ask and answer questions, and to speak on his own behalf. (Pen. Code, § 3041.5, subd. (a).) Section 8(b) and Penal Code section 3041.2 afford no such notice and opportunity to be heard with regard to the Governor's review of the BPT parole decision. Petitioner cites *Morrissey* v. *Brewer* (1972) 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593] for the proposition the absence of any such protections violates his right to procedural due process.

*Morrissey* holds that proceedings for *parole revocation* must conform to minimum due process requirements, including the right to be heard and produce evidence, to confront and cross-examine adverse witnesses, and to a written statement by the fact finder of the evidence relied upon and reasons for revoking parole. (408 U.S. at p. 489 [33 L.Ed.2d at p. 499].) In *In re Prewitt* (1972) 8 Cal.3d 470 [105 Cal.Rptr. 318, 503 P.2d 1326], the court held *Morrissey* included proceedings to rescind a parole that has been granted but not executed, i.e., the date for the parolee's release has not yet arrived. (*Id.* at pp. 473-475.)

*Morrissey* has never been extended, however, to BPT proceedings to fix the terms of prisoners or to determine whether to grant parole. (See *In re Sturm, supra,* 11 Cal.3d 258, 266-269; *In re Prewitt, supra,* 8 Cal.3d at p. 475.) As noted in *In re Sturm, supra,* there is a substantial distinction between parole revocation and discretionary parole release. Parole revocation involves the loss of a parolee's conditional liberty. (11 Cal.3d at p. 266.) In contrast, parole release concerns a mere anticipation or hope of freedom. In addition, a decision to release on parole is an " 'attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts . . . .' " (*Ibid.*; see also *In re Thomas* (1984) 161 Cal.App.3d 721, 732 [206 Cal.Rptr. 719].) For these reasons, the minimum due process requirements which must be afforded prisoners in respect to the parole release determination are to be decided on a case by case basis. (*In re Sturm, supra,* 11 Cal.3d at p. 266.)

In this case, the petitioner did not have an effective parole date because the review process was not yet exhausted. Under the circumstances, petitioner was provided the procedural due process to which he was constitutionally entitled. Prior to his hearing before the BPT hearing panel, petitioner was afforded the opportunity to review his file and enter a written response to any material contained therein. (Pen. Code, § 3041.5, subd. (a)(1).) At the hearing, petitioner was entitled to representation by counsel (Pen. Code, § 3041.7), to speak on his own behalf and to ask and answer questions. (Pen. Code, § 3041.5, subd. (a)(2).) He had the right to present any relevant evidence relating to mitigating circumstances, disputed facts or release planning. (Cal. Code Regs., tit. 15, § 2249.) Petitioner was entitled to a written statement specifying the decision, the information considered and the reasons for the decision. (Pen. Code, § 3041.5, subd. (b)(1)-(2).) Finally, petitioner was entitled to a transcript of the hearing. (Pen. Code, § 3041.5, subd. (a)(4).)

With the exception of the obligation of the Governor to furnish a prisoner a written statement specifying his reasons for reversing or modifying a

parole decision (see Pen. Code, § 3041.2), none of the aforementioned protections is available to a prisoner during the Governor's review of a decision regarding parole release. It does not follow, however, that petitioner was thereby deprived of procedural due process. As we construe section 8(b) and Penal Code section 3041.2, the Governor's review is limited to the record that was before the parole authorities. Additionally, section 8(b) directs the Governor to base his decision on the same factors which the BPT was required to consider in making its parole release decision. If a life prisoner wishes to challenge the Governor's review as arbitrary or capricious, the prisoner has an adequate remedy via a writ of habeas corpus. (See *In re Sturm, supra,* 11 Cal.3d at p. 269.)

The procedures surrounding the parole release determination of the BPT provided petitioner the process which was his constitutional due. We perceive no unfairness to petitioner in not extending these procedures to the Governor's limited review of that decision.

## IV

██ When petitioner committed his crime in October 1977, parole decisions were exclusively within the province of the BPT. (See *In re Fain* (1983) 145 Cal.App.3d 540, 547-548 [193 Cal.Rptr. 483].) Section 8(b) was added to the Constitution by an initiative passed on November 8, 1988. Petitioner argues section 8(b) cannot lawfully be applied to a prisoner serving an indeterminate life term for a murder committed before the effective date of the constitutional amendment. Retroactive application of section 8(b), claims petitioner, would violate constitutional proscriptions against ex post facto laws.

██ Both the federal and state Constitutions prohibit the passage of ex post facto laws. (U.S. Const., art. I, §§ 9, 10; Cal. Const., art. I, § 9.)[4] These constitutional provisions exist "to assure individuals fair notice of the nature and consequences of criminal behavior and to prevent the alteration of preexisting rules subsequent to the commission of an act." (*Evans* v. *Thompson* (4th Cir. 1989) 881 F.2d 117, 120.) According to Blackstone, a law is ex post facto "when *after* an action is committed, the legislator then for the first time declares it to have been a crime, and inflicts a punishment upon the person who has committed it; here it is impossible that the party could foresee that an action, innocent when it was done, should be afterwards converted to guilt by a subsequent law; he had therefore no cause to abstain

---

[4]"[N]either the language nor the history of the state ex post facto clause supports a different interpretation" from that accorded the cognate federal constitutional provision. (*Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 295 [279 Cal.Rptr. 592, 807 P.2d 434].)

from it; and all punishment for not abstaining must of consequence be cruel and unjust." (Italics in original, 1 Blackstone's Commentaries 46.)

"Although the Latin phrase 'ex post facto' literally encompasses any law passed 'after the fact' it has long been recognized by this Court that the constitutional prohibition on *ex post facto* laws applies only to penal statutes which disadvantage the offender affected by them. [Citations.]" (Fn. omitted, *Collins* v. *Youngblood* (1990) 497 U.S. 41 [111 L.Ed.2d 30, 38, 110 S.Ct. 2715], hereafter cited as *Collins.*) Early opinions of the United States Supreme Court defined "ex post facto law" as a term of art with an established meaning at the time of the framing of the Constitution. (See e.g. *Calder* v. *Bull* (1798) 3 U.S. (3 Dall.) 386, 390-392 [1 L.Ed. 648, 650-651]; *Fletcher* v. *Peck* (1810) 10 U.S. (6 Cranch) 87, 138 [3 L.Ed. 162, 178]; *Cummings* v. *Missouri* (1867) 71 U.S. (4 Wall.) 277, 325-326 [18 L.Ed. 356, 363-364].) This established meaning was first delineated in *Calder* v. *Bull, supra,* wherein Justice Chase expounded upon those legislative acts which implicate the primary concerns of the ex post facto clauses:

"1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime,* or makes it greater than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offense, *in order to convict the offender.*" (Italics in original, 3 U.S. at p. 390 [1 L.Ed. at p. 650].)

The federal Supreme Court opinions which followed portrayed *Calder* as setting forth the exclusive definition of ex post facto laws. (See e.g., *Fletcher* v. *Peck, supra,* 10 U.S. at p. 138 [3 L.Ed. at p. 178]; *Cummings* v. *Missouri, supra,* 71 U.S. at pp. 325-326 [18 L.Ed. at pp. 363-364]; *Gibson* v. *State of Mississippi* (1896) 162 U.S. 565, 590 [40 L.Ed. 1075, 1081, 16 S.Ct. 904].) So well accepted was the *Calder* formulation that in *Beazell* v. *Ohio* (1925) 269 U.S. 167 [70 L.Ed 216, 46 S.Ct. 68] the court summarized the meaning of the ex post facto clauses as follows:

"It is settled, by decisions of this court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done, which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at

the time when the act was committed, is prohibited as *ex post facto*." (Italics in original, 269 U.S. at pp. 169-170 [70 L.Ed. at p. 217].)[5]

Recently in *Collins, supra,* the court reaffirmed "[t]he *Beazell* formulation [as] faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause: Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." (497 U.S. at p. 43 [111 L.Ed.2d at p. 39].) The *Collins* court continued, "[a]lthough increased punishments are not mentioned explicitly in the historical sources, the Court has never questioned their prohibition, apparently on the theory that '[t]he enhancement of a crime, or penalty, seems to come within the same mischief as the creation of a crime or penalty.' [Citation.]" (*Collins, supra,* 497 U.S. at p. 44 [111 L.Ed.2d at p. 40].)

In light of *Collins*, all ex post facto challenges must be resolved solely by reference to the categories of laws prohibited under the *Beazell* formulation of the ex post facto doctrine. (See *Tapia* v. *Superior Court, supra*, 53 Cal.3d at pp. 294-295.) ▇▇▇ The principal issue here is whether section 8(b) falls within one of the three prohibited categories.

There is nothing within section 8(b) which falls within any of the *Beazell* categories such as to constitute an ex post facto law as applied to petitioner. Section 8(b) does not punish a previously innocent act. Nor does it alter the definition of the crime of murder or deprive one charged with murder of a previously recognized defense to the crime. Finally, section 8(b) does not increase the punishment for murder. Section 8(b) merely provides for discretionary review by the Governor of BPT decisions relating to the parole of life prisoners convicted of murder. Because it does not fall within any of the categories enumerated in *Beazell*, it is not an ex post facto law. (Cf. *Raimondo* v. *Belletire* (7th Cir. 1986) 789 F.2d 492, 495-496.)

▇▇▇ To operate ex post facto, a law must clearly be disadvantageous in character. (*In re Ramirez* (1985) 39 Cal.3d 931, 934-935 [218 Cal.Rptr. 324, 705 P.2d 897].) ▇▇▇ Section 8(b) does not satisfy this criterion. It allows the Governor, with respect to a BPT decision granting, denying, revoking or suspending parole, to affirm, modify or reverse that decision. Thus, section 8(b) may operate to the benefit of a prisoner whose parole has been denied, revoked or suspended.

---

[5]The *Beazell* definition omitted the reference in *Calder* to alterations in legal rules of evidence. In *Collins, supra,* the court explained the reason for this omission: "As cases subsequent to *Calder* make clear, this language was not intended to prohibit the application of new evidentiary rules in trials for crimes committed before the changes." (497 U.S. at p. 43, fn. 3 [111 L.Ed.2d at p. 39].)

■ Moreover, in deciding whether a new law is disadvantageous, the issue is not the actual application to the petitioner, "but whether the standards . . . have been altered to [the petitioner's] detriment." (*In re Stanworth* (1982) 33 Cal.3d 176, 186 [187 Cal.Rptr. 783, 654 P.2d 1311].) ■ Section 8(b) alters no standards to petitioner's detriment. As we have indicated, the Governor's review is confined to the record before the BPT. Additionally, section 8(b) directs the Governor to base his decision on the same factors which the hearing panel is required to consider in making its parole suitability decision. Finally, section 8(b) does not change the criteria governing a life prisoner's release on parole. (See Pen. Code, § 3041, subd. (a); Cal. Code Regs., tit. 15, § 2281.) While in this instance the Governor's decision was not to petitioner's benefit, the fact remains a procedural change to add a level of executive review of parole decisions is not perforce disadvantageous within the meaning of the ex post facto clause. (See generally *In re Ramirez, supra,* 39 Cal.3d 931, 935-936; *Raimondo* v. *Belletire, supra,* 789 F.2d at pp. 495-496; *Mosley* v. *Klincar* (N.D.Ill. 1989) 711 F.Supp. 463, 468.)

■ Petitioner is correct that the simple labeling of a law as "procedural" does not insulate it from ex post facto implications. (See *Gibson* v. *Mississippi, supra,* 162 U.S. at p. 590 [40 L.Ed. at p. 1081].) "[A] procedural change may constitute an *ex post facto* violation if it 'affect[s] matters of substance' [citation], by depriving a defendant of 'substantial protections with which the existing law surrounds the person accused of crime,' [citation], or arbitrarily infringing upon 'substantial personal rights.' [Citations.] [¶] . . . Subtle *ex post facto* violations are no more permissible than overt ones. In *Beazell, supra,* we said that the constitutional prohibition is addressed to laws, 'whatever their form,' which make innocent acts criminal, alter the nature of the offense, or increase the punishment. [Citation.]" (*Collins, supra,* 497 U.S. at p. 45-46 [111 L.Ed.2d at pp. 40-41].)

*Collins* teaches that the critical factor is not whether a law can be labeled as "substantive" or "procedural," but whether that law when applied impinges on one of the categories set forth in *Beazell.* (*Collins, supra,* 497 U.S. at p. 46 [111 L.Ed.2d at p. 41].)

■ It can be argued, of course, that section 8(b) fits into that *Beazell* category which prohibits laws that subject a prisoner after the fact to greater punishment. But the argument necessarily will fail. Petitioner was convicted of first degree murder and given a life sentence. Application of section 8(b) to him has not changed and cannot change the quantum of punishment annexed to his crime when he was convicted. Indeed, nothing within section 8(b) empowers the Governor to increase petitioner's sentence. Section 8(b)

simply allows for an additional level of discretionary review of parole decisions regarding murderers serving an indeterminate life sentence. Such an adjustment to the procedure for reviewing parole release decisions is collateral to the penalty itself. Section 8(b) is not ex post facto as applied to petitioner.

We find support for this conclusion in *Mallett* v. *North Carolina* (1901) 181 U.S. 589 [45 L.Ed. 1015, 1 S.Ct. 730]. In *Mallett*, two defendants were convicted of conspiracy to defraud and sentenced to two years' imprisonment. On appeal the judgments were reversed and defendants granted a new trial. While the appeal was pending, legislation was enacted giving the People the right to further appellate review in the state Supreme Court of an order of the lower appellate court granting defendant a new trial. The People exercised this right, and the Supreme Court reversed the judgment of the lower appellate court and remanded the cause to the trial court with directions the sentence originally imposed by that court be executed.

At issue in *Mallett* was whether the law allowing a People's appeal to the state Supreme Court violated the ex post facto proscription when applied to defendants whose crimes were committed prior to the date the law went into effect. The *Mallett* court found no ex post facto violation. The court stated: " 'The next exception in the petition is that at the time of the commission of the offense the statute allowed no appeal to the state from the ruling of the [lower appellate] court judge. But the defendants had no "vested rights" in the remedies and methods of procedure in trials for crime. They cannot be said to have committed this crime relying upon the fact that there was no appeal given the state in such cases. If they had considered that matter, they must have known that the state had as much power to amend [the law] and they committed the crime subject to the probability that appeals in rulings upon matters of law would be given the state from these intermediate courts. . . .'

" '. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

" '[S]o far as mere modes of procedure are concerned a party has no more right, in a criminal than in a civil action, to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place. Remedies must always be under the control of the [L]egislature, and it would create endless confusion in legal proceedings if every case was to be conducted only in accordance with the rules of practice, and heard only by the courts in existence when its facts arose. The [L]egislature may abolish courts and create new ones, and it may prescribe altogether different modes of procedure in its discretion, [but] it cannot lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime. [Citations.]'

"Applying the principles established . . . we think it may be concluded that the legislation of North Carolina in question did not make that a criminal act which was innocent when done; did not aggravate an offense or change the punishment and make it greater than when it was committed; . . . and did not deprive the accused of any substantial right or immunity possessed by them at the time of the commission of the offense charged." (181 U.S. at pp. 593-597 [45 L.Ed. at pp. 1018-1020].)

If allowing for higher court review of intermediate court decisions does not violate ex post facto proscriptions, we fail to see how allowing for executive review of parole decisions can be otherwise. "[M]any cases . . . have held that statutory changes that merely shift the balance of procedural advantages a little against the defendant can be applied retroactively without becoming ex post facto laws . . . ." (*Prater* v. *U.S. Parole Com'n* (7th Cir. 1986) 802 F.2d 948, 953, and authorities cited therein.) As in *Mallett*, application of section 8(b) does not impinge upon any of the *Beazell* categories.

Petitioner's reliance on *Weaver* v. *Graham* (1981) 450 U.S. 24 [67 L.Ed.2d 17, 101 S.Ct. 960] is misplaced. At issue in *Weaver* was a Florida statute which reduced the amount of good time credits prisoners could earn, although the new law did not disturb credits earned prior to its effective date. The affected prisoner committed his offense at the time the predecessor statute was in effect. He argued that by reducing the rate at which he could earn credits, the state had increased the time he would have to serve in prison. The *Weaver* court agreed, holding the new statute an unconstitutional ex post facto law because it made more onerous the punishment for crimes committed before its enactment by restricting the inmate's opportunity for early release. (At pp. 32-34 [67 L.Ed.2d at pp. 24-26].)

Florida argued there was no ex post facto problem because good time credits were not a part of the prisoner's sentence. The *Weaver* court disagreed, holding the potential increase in actual time served constituted an ex post facto violation. The court deemed it relevant that "a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." (450 U.S. at p. 32 [67 L.Ed.2d at p. 25].) The court concluded: "[W]e need not determine whether the prospect of the gain time was in some technical sense part of the sentence to conclude that it in fact is one determinant of petitioner's prison term—and that his effective sentence is altered once this determinant is changed. . . . [¶] . . . By definition, this reduction in gain-time accumulation lengthens the period that someone in petitioner's position must spend in prison." (*Id.* at pp. 32-33 [67 L.Ed.2d at pp. 25-26].)

The distinction between reduction of good time credits and review of parole release decisions is one of kind, not degree. When earned, good time credits shorten the prisoner's sentence. To change that scheme by reducing the amount of credits that can be earned unquestionably lengthens a prisoner's sentence.

There is no such problem here. Section 8(b) does not eliminate petitioner's right to parole. Nor does it lengthen the period which petitioner must remain in prison before becoming eligible for parole. Section 8(b) simply allows the Governor the discretionary authority to review parole decisions for life termers convicted of murder. Because section 8(b) does not affect petitioner's right to parole or his right to have that decision based on the same factors as are applied to other life prisoners, there is no ex post facto violation.

There is nothing within the ex post facto clause which confers upon petitioner an unalterable right to have the question of his release on parole determined by the exact method in existence on the date he committed his crime. ■■■ "[T]he constitutional provision [regarding ex post facto laws] was intended to secure substantial personal rights against arbitrary and oppressive legislation [citation], and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." (*Beazell, supra,* 269 U.S. at p. 171 [70 L.Ed. at p. 218].) ■■■ Parole release decisions have always been within the exclusive province of the executive branch. Allowing for or removing discretionary gubernatorial review of parole release decisions in no way affects petitioner's substantial right to seek parole or to have that right properly considered.

To conclude otherwise would create serious implications for the workings of the criminal justice system. That system presupposes the Legislature will routinely undertake to improve the procedures related thereto. (See *Evans* v. *Thompson, supra,* 881 F.2d at p. 121.) "To hold that every change with an arguable adverse impact" upon a defendant has ex post facto implications "would seriously inhibit this process of reform, because legislation generally has an effective date of enactment independent of the date of the commission of an act. The elusive nature of the *ex post facto* prohibition derives from the fact that law does and should evolve." (Italics in original, *ibid.*) The United States Supreme Court has held "the accused is not entitled of right to be tried in the exact mode, in all respects, that may be prescribed for the trial of criminal cases at the time of the commission of the offense charged against him." (*Thompson* v. *State of Utah* (1898) 170 U.S. 343, 351 [42 L.Ed. 1061, 1067, 18 S.Ct. 620], overruled on other grounds in *Collins, supra,* 497 U.S.

at pp. 51-52 [111 L.Ed.2d at p. 45].) This analysis applies as well to the procedure for review of parole release decisions.[6]

The order to show cause is discharged and the petition for writ of habeas corpus is denied.

Davis, J., and Raye, J., concurred.

Petitioner's application for review by the Supreme Court was denied September 3, 1992.

---

[6]Defendant also argues that application to him of section 8(b) violates the rule that legislation is presumptively prospective. (See *Tapia* v. *Superior Court, supra,* 53 Cal.3d at p. 287 ["[A] new statute is presumed to operate prospectively absent an express declaration of retrospectivity or a clear indication that the electorate, or the Legislature, intended otherwise."].) The People respond section 8(b) has not been applied in a retrospective fashion; to the contrary, section 8(b) was applied prospectively to a parole decision occurring long after its effective date. Both parties shoot wide of the mark. "[T]he true distinction is between *ex post facto* laws, and retrospective laws. Every *ex post facto* law must necessarily be retrospective; but every retrospective law is not an *ex post facto* law. The former, only, are prohibited." (Italics in original, *Calder* v. *Bull, supra,* 3 U.S. at p. 391 [1 L.Ed. at p. 650].) There is no question application of section 8(b) in the instant case has a retrospective effect. The question is whether retrospective application violates ex post facto proscriptions.