[No. B094909. Second Dist., Div. Seven. Nov. 21, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
ELAINE GODWIN, Defendant and Appellant.

## COUNSEL

Cynthia L. Barnes, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter and Uzzi O. Raanan, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JOHNSON, J.**—Elaine Godwin appeals from the judgment entered following a jury trial resulting in her convictions for five counts of second degree robbery and attempted second degree robbery (Pen. Code, §§ 211, 213), with five findings she used a deadly and dangerous weapon, a starter pistol (Pen. Code, § 12022, subd. (b)), and three findings the victim was sixty-five years of age or older (Pen. Code, § 667.9, subd. (a)). She contends: "I. The trial court violated appellant's right to a fair trial by restricting the defense cross-examination of an adverse witness. II. Modifications to the reasonable doubt jury instruction failed to adequately define that standard as required by the federal Constitution and violated ex post facto principles of the State and Federal Constitutions. III. Appellant's sentence in this matter was improperly enhanced pursuant to Penal Code section 12202(b)."

### FACTS

I.  *Count 2 Robbery as to Louise Fischer With the Use of a Deadly and Dangerous Weapon and a Finding the Victim Was 65 Years of Age, or Older.*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]), the evidence established that at 1:55 a.m. on September 8, 1994, Louise Fischer, age 75, was sitting on a bench in front of Robert's Department Store, which was nearby a Sav-On Drug Store on Atlantic Avenue in Long Beach. Appellant chatted with Fischer briefly, telling Fischer she was waiting for a ride to go to work. Suddenly, appellant demanded Fischer's purse. When Fischer refused, appellant flipped open her blouse and showed Fischer an iridescent, square object, which Fischer believed might be a handgun. Appellant told Fischer someone in the parking lot was watching her and Fischer, now afraid, turned over her purse to appellant. Appellant instructed Fischer to remain there for 15 minutes and left.

II. *Count 3 Robbery as to Roy Zornes With the Use of a Deadly and Dangerous Weapon and a Finding the Victim Was 65 Years of Age, or Older*

Roy Zornes, age 79, testified that on September 26, 1994, he left the Sav-On Drug Store at 4570 Atlantic Boulevard in Long Beach and got into his car. Appellant approached. Appellant said she needed a ride since her car battery was dead and she had to get to her mother's house four blocks away in order to get to work at a hospital. She begged him to take her, and he agreed. On Linden Avenue, she had him pull over to the curb as if she was at her mother's residence, pulled out a handgun and pointed it at him and demanded money. She took $24 out of his wallet and his car keys and threatened to shoot him, then fled with the car keys. Zornes identified a starter pistol in court as the gun appellant used during the robbery and said the gun used during the robbery was "a little black gun about four to five inches long."

III. *Count 4 Robbery as to Vinzent Warren With the Use of a Deadly and Dangerous Weapon*

Vinzent Warren, age 80, was deceased at the time of the trial. Warren testified at the preliminary hearing that at 2 p.m. on October 20, 1994, he was walking to his car in the Sav-On parking lot on Atlantic Avenue when appellant approached him. She claimed her car broke down and she asked for a ride. He gave her the ride. At California and 55th Streets, she told him to stop and to get out his wallet. She pointed at him the barrel of a blue steel revolver which was in her lap. She removed $370 from his wallet and took his car keys and threatened to shoot and kill him. She told him to wait in the car for 20 minutes and walked off with his keys. Warren described the handgun appellant used during the robbery as a "blue steel revolver with a short barrel." He never saw the gun's handle.

IV. *Count 5 Attempted Robbery as to Claire Pollard With the Use of a Deadly and Dangerous Weapon*

At 6:45 p.m. or so on October 29, 1994, 59-year-old Claire Pollard left the Sav-On Drug Store at 4570 Atlantic Avenue in Long Beach with her husband, 57-year-old Thomas Pollard.[1] Appellant approached and asked for a ride, claiming her car had run out of gasoline. She said she was a nurse and had to get to work. The Pollards agreed, and appellant had them drive into a residential area near her originally stated destination at Market Street and

---

[1] The jury acquitted appellant of count 6, a charge of the attempted robbery of Thomas Pollard.

Atlantic Avenue. Thomas Pollard became suspicious and said, "This is as far as we go," and he stopped the minivan. Appellant got out of the minivan after Claire Pollard got out and opened the side sliding door for appellant. As Claire Pollard returned to the minivan's front passenger seat, appellant stood at Claire Pollard's open front door with a small handgun in her hand and demanded money. Claire Pollard got upset, got out of the minivan and said, "I belong to Jesus Christ and you are in deep trouble." Appellant backed off. Then Claire Pollard returned to her car seat and closed her door and Thomas Pollard drove off.

At the trial, the prosecutor had Claire Pollard examine the starter pistol and asked her if that was the handgun appellant used during the attempted robbery. Claire Pollard testified it did not appear to be the same gun. Claire Pollard explained the gun appellant displayed to her was "just a little tiny, about this big." The court indicated for the record Claire Pollard had indicated an item about three inches long. Claire Pollard said, when she confronted appellant, she did not know if the gun was loaded or not. Appellant did not point the gun at either one of them and did not expressly threaten to shoot. But appellant confronted Claire Pollard by positioning herself with her back against the open front passenger door and standing "a little bit" against Claire Pollard. Appellant had the gun in her hand at that time and said, " 'Well, just give me your money. Just give me your money, then nothing will happen.' "

### V.  *Count 7 Robbery as to Richard Larson With the Use of a Deadly and Dangerous Weapon.*

On October 31, 1994, 61-year-old Richard Larson walked to his car parked in the Sav-On Drug Store's parking lot. A young woman approached and claimed her car had broken down. The woman asked Larson if he could drive her about 12 blocks north to Market Street and Atlantic Avenue to a nursing home for work. He agreed. At 56th Street, she told him to turn right and then turn right again and she told him to stop. He followed her directions. Suddenly, she took his keys from his ignition and pulled a gun from her bra. She pointed the gun at him, told him twice she would "shoot to kill," and demanded his money. He gave her $240 or $250 and she fled with his car keys.

Appellant had an appearance similar to the female robber's, but he was not sure appellant was the robber. The starter pistol in court was similar in size and color to the handgun the woman used during the robbery. The prosecutor indicated the starter pistol appeared to be a "simulated revolver-type weapon." Larson's reply was, during the robbery, appellant had the

weapon covered with her hand. Larson described how appellant pointed the gun in his general direction and a little forward at about her waist and chest height.

### VI. Count 1 Robbery as to Ben Davis With a Finding Davis Was 65 Years of Age, or Older.

About 3 p.m. on November 9, 1994, 84-year-old Ben Davis was returning to his car in the Sav-On parking lot at 4570 Atlantic Avenue in Long Beach. Appellant approached, claimed to be a nurse, and said she had to be at work at a hospital and her car had broken down. She asked if he could take her home, which was three blocks away, and then to work. He agreed. She had him turn off Atlantic Avenue at Market Street and then drive several blocks to Linden Avenue. Davis became concerned and stopped his car because her directions were vague or contradictory. He began feeling things were not "right." She took the keys from his ignition and he grabbed her wrist. She said, " 'I have a gun.' " He held her wrist. There was a short standoff, then appellant said, " 'I'm not doing this of my own free will. There are some men that are making me do it and they are right over there.' " She pointed and said, " 'You wouldn't want them coming and jumping on you.' " He became fearful and let go of her wrist. She asked for money and took the $99 he had in his wallet. She told him, " 'When this car behind us goes by, don't make a move. Don't say anything. Don't give any signals.' " She then said, " 'Tell them that you're just taking me someplace.' " The car behind them turned out to be a police car. The officer got out of the police car with his revolver drawn and yelled for appellant to get out of the car. She finally complied and, as she got out, she returned Davis's car keys.

### VII. The Arrest.

On November 9, 1994, Long Beach Police Officer Joseph Bahash was engaged in a surveillance of the parking lot of the Sav-On Drug Store for a female robbery suspect who was targeting elderly persons. Bahash explained he had selected that location for a surveillance since he had received a bulletin indicating six or seven robberies had occurred near the location and he specifically mentioned the Fischer robbery and the Warren robbery and said all the incidents involved in the trial were mentioned in the bulletin. During the surveillance, Bahash saw appellant approach Davis and drive away with Davis in Davis's car. Bahash followed them, but lost Davis's car at a light. Another police officer, Sergeant Allen, found Davis in his car and apprehended appellant. At the open passenger door to Davis's car, Officer Otero leaned over and found on the car floorboard a small, black handgun with a brown handle, which was the starter pistol in evidence during the

trial. The parties stipulated the "firearm" seized by the police and present in court as evidence was a starter pistol.

After the arrest and a waiver of *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), appellant told Bahash Davis made her get into his car and he then lent her the $99 which she had in her possession upon arrest so that she could renew her license at the nearby Department of Motor Vehicles. Bahash confronted appellant with Davis's version of the events and appellant told him she took Davis's money by force, she carried her gun in her bra and she admitted she committed the robberies, although she disputed she took as much money as the victims claimed. Bahash described the robberies in factual terms to appellant and then appellant would say, yes, she committed that offense. Appellant asked if Bahash thought she would get probation, and he said no. She asked about an own recognizance release and volunteered she did not hurt anyone. At the end of the interview, she told him she needed the money.[2]

During cross-examination, trial counsel asked Bahash, "Okay. Let me ask you about the bulletin. [¶] The bulletin also contains information about a woman pulling—." The prosecutor interrupted and objected. During the next recess in the proceedings, trial counsel argued to the court the bulletin contained an uncharged robbery not attributed to appellant which he wanted to elicit from Bahash. Trial counsel argued the identification of appellant as the robber in all of the offenses was based partly on modus operandi evidence. Trial counsel urged the defense was entitled to elicit evidence tending to support a theory a different woman was also committing robberies at the location. Trial counsel argued Bahash had testified about the contents of the bulletin during the direct testimony, and the defense was entitled to cross-examine on it.

The prosecutor explained to the court the other robbery occurred on September 24, 1994, at a Haystack Motel at 4675 Long Beach Boulevard in Long Beach. The robbery involved a female and the use of a blue steel automatic, which was removed from a bra.

The court ruled the robbery was at a different location, the People might not have a victim in that offense, it was "rather remote" and it was not relevant. The court sustained a hearsay objection. Trial counsel then complained about the court's ruling since there was a police report for the incident and the description of the crime in the report was specific.

---

[2]Bahash also opined the photographic lineup shown the robbery victims by the defense investigator could have been misleading since the photographs were not the same size and the persons depicted did not have the same skin color. Also, photograph No. 3 was larger than the other photographs.

In her defense, appellant testified that on November 9, 1994, she asked Davis for a ride to traffic school and Davis got mixed up. She went into her bra to get written directions to the traffic school and the starter pistol in her bra just fell out into her lap. Davis jumped to the conclusion it was a robbery and he gave her money, which he just dropped in her lap. She protested she was not robbing him, but the police car pulled up. She told Davis to tell them he was giving her a ride and put his money in her pocket since returning the money would make it appear to Davis appellant was committing robbery. She put the starter pistol on the floorboard. She denied the other robberies in her testimony, but admitted she told Bahash she committed some of those robberies. She claimed she told Bahash what he wanted to hear since he was acting mean.[3]

## DISCUSSION

### I. *The Limitation of Cross-examination Relative to an Uncharged Robbery Was Harmless.*

■ The contention the court improperly limited cross-examination of Bahash by trial counsel, which improperly prevented the defense from impeaching Bahash and rebutting the People's modus operandi evidence, lacks merit. Assuming the evidence was admissible to impeach Bahash or was relevant to rebut modus operandi evidence, any error was utterly harmless. This case presented a classic "corpus" and "cop-out" and, as such, the evidence of appellant's guilt was overwhelming. Appellant was identified in court by all but one of the victims as the robber. Larson, the only victim who did not identify appellant, testified appellant and her gun were "similar" to his robber and her handgun. After appellant's arrest, appellant told Bahash she committed the offenses and the content of the interview indicated appellant was cognizant of the details of the various robberies. Appellant's trial repudiation of her admissions to Bahash was incredible. The court's refusal to permit defense cross-examination as to the other incident of robbery did not result in depriving the defense of material evidence which would have exonerated appellant and there was no denial of due process. (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People* v. *Cudjo* (1993) 6 Cal.4th 585, 611 [25 Cal.Rptr.2d 390, 863 P.2d 635]; *People* v. *Redmond* (1981) 29 Cal.3d 904, 912 [176 Cal.Rptr. 780, 633 P.2d 976].)

---

[3]A defense investigator testified he showed some of the victims a six-pack photographic display containing appellant's photograph. Fischer identified appellant. Claire Pollard said the robber could have been the person depicted in photograph 2, 3 or 5. Zornes said photograph 3 looked familiar, but he was not sure. Larson made no identification. The defense investigator, a former police officer, indicated he was not personally satisfied with the photographs he had available for the photographic display since they were not of a uniform size and quality.

## II.   *The Trial Court Properly Instructed the Jury as to Reasonable Doubt.*

■    Appellant contends instructing the jury with the 1994 revision to CALJIC No. 2.90 was error of constitutional dimension since it did not correctly convey the concept of reasonable doubt to the jury. *Victor* v. *Nebraska* (1994) 511 U.S. 1 [127 L.Ed.2d 583, 114 S.Ct. 1239], affirming *People* v. *Sandoval* (1992) 4 Cal.4th 155 [14 Cal.Rptr.2d 342, 841 P.2d 862], stated the test for a constitutional instruction on reasonable doubt: ". . . so long as the court instructs the jury on the necessity that the defendant's guilt be proven beyond a reasonable doubt, . . . the Constitution does not require that any particular form of words to be used in advising the jury of the government's burden of proof. . . . Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.'" (511 U.S. at p. 5 [127 L.Ed.2d at p. 590, 114 S.Ct. at p. 1243], citations omitted.) *Victor* opined the terms as found in California's CALJIC No. 2.90 jury instruction, "moral evidence" and "moral certainty," may have lost their historical meaning, but in the context of the entire CALJIC No. 2.90 instruction, *Victor* found no constitutional infirmity. (511 U.S. at pp. 10-17 [127 L.Ed.2d at pp. 592-597, 114 S.Ct. at pp. 1245-1248].) *Victor* also said: "Although . . . moral certainty is ambiguous in the abstract, the rest of the instruction given in [the] case lends content to the phrase. The jurors were told that they must have 'an abiding conviction, to a moral certainty, of the truth of the charge.' . . . An instruction cast in terms of an abiding conviction as to guilt, without reference to moral certainty, correctly states the government's burden of proof." (511 U.S. at pp. 14-15 [127 L.Ed.2d at p. 596, 114 S.Ct. at p. 1247], citation omitted.)

Following *Victor*, the California Supreme Court in *People* v. *Freeman* (1994) 8 Cal.4th 450, 504, footnote 9 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888], recommended trial courts give the very instruction used here, which modified former CALJIC No. 2.90 by striking the phrases, "and depending on moral evidence" and "to a moral certainty." The trial court in the instant case instructed the jury as to reasonable doubt with the 1994 revision to CALJIC No. 2.90, which conforms exactly to the jury instruction suggested in *Freeman*. Defining the People's burden of proof as requiring an "abiding conviction of the truth of the charge" complies with the test stated in *Victor*. *Freeman*'s suggested modifications to CALJIC No. 2.90 may be dicta, but as dicta in a California Supreme Court decision, it is entitled to great deference by this court. (*Evans* v. *City of Bakersfield* (1994) 22 Cal.App.4th 321, 328 [27 Cal.Rptr.2d 406]; see *Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

Penal Code section 1096 was amended, effective July 3, 1995, to define reasonable doubt in the terms suggested by *Freeman*. (Stats. 1995, ch. 46,

(Assem. Bill No. 1113), § 1, eff. July 3, 1995.) Since appellant's offenses and her trial occurred prior to that date, appellant claims in this appeal applying the amendment to Penal Code section 1096 to her violates the prohibition against ex post facto laws. However, the 1994 decision in *Freeman* predated appellant's offenses, giving her plenty of notice of any change in the law. Furthermore, the change in the instruction and Penal Code section 1096 does not violate ex post facto principles. (See *In re Arafiles* (1992) 6 Cal.App.4th 1467, 1483 [8 Cal.Rptr.2d 492].) The *Freeman* court and Penal Code section 1096 did nothing more than restate the standard for reasonable doubt in more modern, understandable terms. If there was a change in the instruction, it was to appellant's benefit since the 19th-century language had changed meaning in this century, potentially to something less than the standard of reasonable doubt. (*Victor* v. *Nebraska, supra*, 511 U.S. at pp. 13-14 [127 L.Ed.2d at p. 595, 114 S.Ct. at p. 1247].) *Freeman* and Penal Code section 1096 did not change the standard of reasonable doubt—they just utilized more up-to-date and more descriptive phraseology for it. (See *People* v. *Freeman, supra*, 8 Cal.4th at p. 503.)

III. *The Evidence Is Substantial in Supporting the Jury's Findings of the Use of a Deadly and Dangerous Weapon.*

The contention the Penal Code section 12022, subdivision (b), findings must be stricken since the evidence is insufficient to support the findings lacks merit.

█ The evidence is more than sufficient to support the findings of the jury as to the weapon use in the Fischer, Warren and Pollard robberies (counts 2, 4 and 5). During those incidents, it was apparent appellant had a handgun other than the starter pistol seized by the police. Appellant displayed or pointed those firearms at the victims and/or threatened to shoot them and otherwise behaved as if she had a loaded handgun. She displayed the handgun during the robberies so as to "use" the firearms within the meaning of Penal Code section 12022, subdivision (b). (*People* v. *Monteil* (1993) 5 Cal.4th 877, 917 [21 Cal.Rptr.2d 705, 855 P.2d 1277]; *People* v. *Brookins* (1989) 215 Cal.App.3d 1297, 1305 [264 Cal.Rptr. 240]; *People* v. *Reid* (1982) 133 Cal.App.3d 354, 367 [184 Cal.Rptr. 186].)[4]

---

[4]These counts would have also supported a finding under Penal Code section 12022.5, subdivision (a), but a firearm use enhancement was not pled and proved.

Also, in each of the Penal Code section 12022, subdivision (b), allegations in the information, it was specifically alleged appellant used a starter pistol as the deadly or dangerous weapon. However, that allegation does not limit the People's proof of the instrumentality used as the deadly or dangerous weapon so long as some deadly or dangerous weapon was used. Appellant makes no complaint in this appeal the allegation of a starter pistol misled her to her

■ The robberies of Zornes and Larson were apparently committed with the starter pistol (counts 3 and 7). No expert evidence, or any other evidence, was adduced as to the danger presented by such an instrument.

In closing comments, the prosecutor told the jury: ". . . [T]here are two ways you can find that weapon enhancement appropriate. . . . [Y]ou can find a starter pistol, which has the ability to have the trigger pulled, a loud sound, gases expel, and possibly burns produced if that starter pistol was fired at close range, certainly makes a loud noise, and it certainly can give an old person a heart attack. It's a completely reasonable inference on the evidence. You could find that the weapon used in all the previous incidents by this defendant was the starter pistol, and it's a deadly, dangerous weapon because of the effect it might have on an old person upon being expelled. It is not a firearm, so you couldn't shoot someone with it. But for the other reasons I mentioned, you can find it a dangerous or deadly weapon. Or you could find that the defendant had an actual firearm on the other occasions, and this particular item when she was arrested, she had the starter pistol based on the fact that different witnesses described the gun differently in the testimony of the trial. [¶] . . . [¶] There is [*sic*] two interpretations to these varying descriptions to the weapon. The weapon was different on prior occasions, and based on that difference, you can find it was a deadly or dangerous weapon, a handgun, or that the weapon was the same, just described somewhat differently. And it was a dangerous or deadly weapon for the reasons I indicated, capable of loud noise, expels gases and burns and can frighten an old person. That is the issue in this case."

The People urge this court can conclude the starter pistol is of a class of weapons which are inherently dangerous and speculate in their brief as to the starter pistol's capacity. But the capacity a starter pistol has to inflict injury is not a matter of common knowledge, and the dangerousness of a starter pistol may well be dependent upon the particular starter pistol in question. This court cannot speculate the starter pistol can inflict injury and that the loud noise and the expectation of being shot would cause the elderly to have heart attacks. There was no evidence at trial gases emitting from this starter pistol were dangerous at close range if the starter pistol was discharged. The People cannot fill the evidentiary gap with the prosecutor's speculation at trial of dangerousness or speculation on appeal the starter pistol is an inherently dangerous instrumentality.

In *People* v. *Reid*, the court explained: "There are two categories of 'dangerous or deadly weapons.' First, there are those instrumentalities which

detriment in defending against the allegation. (Pen. Code, §§ 969c, 960; *People* v. *McInerney* (1916) 30 Cal.App. 283, 284 [158 P. 128]; cf. *People* v. *Flynn* (1995) 31 Cal.App.4th 1387, 1394-1395 [37 Cal.Rptr.2d 765].)

are weapons in the strict sense of the word, such a guns, dirks, etc. Second there are those instrumentalities which are not weapons in the strict sense of the word, but which *may* be used as such, such as razors, pocket knives, hat pins, canes, hammers, hatchets, and other sharp or heavy objects. These are not weapons in the strict sense of the word and are not 'dangerous or deadly' to others in the ordinary use for which they are designed. As such, they may not be said as a matter of law to be dangerous or deadly weapons. The instrumentalities falling in the first classification are weapons in the strict sense of the word and are 'dangerous or deadly' to others in the *ordinary use* for which they are designed and may be said as a matter of law to be dangerous or deadly weapons. [Citation.] When it appears that an instrumentality other than one falling within the first category is *capable* of being used in a dangerous or deadly manner, and it may be *fairly inferred* from the evidence that its possessor *intended* on a particular occasion to use it as a weapon should the circumstances require, its character as a dangerous or deadly weapon may be established, at least for purposes of that occasion. [Citations.]" (133 Cal.App.3d at p. 365, citing *People* v. *Graham* (1969) 71 Cal.2d 303, 327-328 [78 Cal.Rptr. 217, 455 P.2d 153], and other cases, italics in original.)

In this case, the evidence is no better than that in *People* v. *Reid, supra,* 133 Cal.App.3d at page 365. *Reid* involved a robbery in which the robber held a metal toy pistol held to the victim's neck. The *Reid* court explained the metal toy gun was an item which was not inherently dangerous in and of itself, and therefore was not a deadly or dangerous weapon as a matter of law. But a metal toy gun was capable of being used as a deadly and dangerous weapon since it could be used as a bludgeon and thus could be the basis for a use of a deadly or dangerous weapon enhancement. But there was no evidence in *Reid* the defendant intended to use the gun as a bludgeon, a prerequisite to the finding it was used as a deadly or dangerous weapon.

The situation here in the absence of any evidence about the starter pistol's capacities as a deadly or dangerous weapon is the same as in *Reid*. The starter pistol was never shown to be capable of being used in the similar fashion to a firearm so as to be a deadly or dangerous weapon as a matter of law. There was no evidence appellant intended to use the starter pistol as a bludgeon, although it could be used as such. In fact, the evidence was to the contrary since appellant backed off so readily when Claire Pollard challenged appellant. The threats to shoot a nondischarging or unloaded starter pistol do not amount to evidence the starter pistol would be used as a bludgeon. On this record, the evidence is insufficient to support the findings of the use of a deadly and dangerous weapon in the Zornes and Larson robberies (counts 3 and 7).

This court will strike the findings entered as to the Zornes and Larson robberies as to the Penal Code section 12022, subdivision (b) enhancements and will vacate the orders imposing two consecutive four-month terms in state prison.[5]

### DISPOSITION

The Penal Code section 12022, subdivision (b), use of a deadly and dangerous weapon enhancement is stricken as to counts 3 and 7, and the orders imposing the two consecutive four-month terms for these enhancements are vacated. The aggregate state prison term is reduced to 13 years. In all other respects, the judgment is affirmed. The superior court shall cause an amended abstract of judgment be sent to the Department of Corrections reflecting the modification to the judgment.

Gold, J.,* concurred.

**WOODS, J., Concurring and Dissenting.**—I dissent from the majority's conclusion that use of a starter pistol, which a robbery victim reasonably believed was a real gun, does not constitute use of a dangerous weapon within the meaning of Penal Code section 12022, subdivision (b) (statutory references are to the Penal Code).

The majority reach their erroneous result by relying upon *People* v. *Reid* (1982) 133 Cal.App.3d 354 [184 Cal.Rptr. 186], a case which misread and misstated the holding of *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. I explain.

In *Aranda*, Justice Traynor considered two disparate weapons provisions that might arise upon retrial. One involved then section 211a which provided

---

[5]At sentencing, the court imposed a 13-year 8-month aggregate term in state prison, as follows:

| Count | Offense | | Term | § 12022(b) | § 667.9 | Total |
|---|---|---|---|---|---|---|
| 2 | robbery | Principal | Upper 5 year | 1 year | 1 year | 7 years |
| 1 | robbery | consec | 1 year | | 4 months | 1 year 4 mo |
| 3 | robbery | consec | 1 year | *4 months* | 4 months | 1 year 8 mo |
| 4 | robbery | consec | 1 year | 4 months | | 1 year 4 mo |
| 5 | att robbery | consec | 8 months | 4 months | | 1 year |
| 7 | robbery | consec | 1 year | *4 months* | | 1 year 4 mo |
| | | | Total: | | 13 year 8 mo | |

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

that robbery "perpetrated . . . by a person being armed with a dangerous or deadly weapon" is robbery of the first degree. The other was section 3024, subdivision (b) and involved minimum sentences for defendants "armed with a deadly weapon."

As to the latter provision Justice Traynor stated: "Section 3024, subdivision (b), of the Penal Code provides that a person with a prior felony conviction is subject to a minimum sentence of four years if at the time of the offense he was 'armed with a deadly weapon.' The disjunctive word 'dangerous' is not used, but the words 'deadly weapon' are defined in subdivision (f) to include 'any . . . pistol, revolver, or any other firearm . . . and any metal pipe or bar used or intended to be used as a club.' Although this definition includes any firearm whether loaded or not, it does not include a toy pistol unless the toy was made of metal and was 'used or intended to be used as a club.' If the weapon cannot be found, the jury may be instructed by the court that it may draw an inference from the circumstances surrounding the robbery that the gun was not a toy. Testimony to the effect that the defendant was flourishing the pistol or pointing it at the victim and was using threatening words or conduct indicating that he intended to fire it if his demands were not met would be evidence from which the inference could be drawn." (63 Cal.2d at p. 533.)

As is obvious, this section 3024 discussion is irrelevant to section 12022, subdivision (b) because the former involves only "deadly" weapons while the latter involves "deadly *or dangerous* weapons." Since section 3024 specified that to qualify as a "deadly weapon" a nonfirearm metal object must be "used or intended to be used as a club"—of course, Justice Traynor, in construing *this* section, said a toy pistol satisfies the definition only if it was " 'used or intended to be used as a club.' " In other words, section 3024 means what section 3024 says.

As to the "armed with a dangerous or deadly weapon" provision of section 211a, Justice Traynor's discussion is apposite because the issue was not "armed" (different from section 12022, subdivision (b) "use") but rather whether a nonfirearm, a metal toy gun, qualified as a "dangerous weapon." This is the identical issue in the instant case.

As to this issue Justice Traynor stated: "Both defendants contend that the evidence does not support findings that they were guilty of first degree robbery or that they were armed with a deadly weapon. Section 211a of the Penal Code provides that robbery 'perpetrated . . . by a person being armed with a dangerous or deadly weapon' is robbery in the first degree. The words 'dangerous or deadly' are used disjunctively and are not equivalents. . . .

Thus, it is not necessary to show that the weapon is deadly so long as it can be shown that it is dangerous. . . . When the weapon involved is a gun, the prosecution need not produce it. Testimony by witnesses who state that they saw what looked like a gun, even if they cannot identify the type or caliber, will suffice. . . . The prosecution does not have to prove either that the gun was loaded . . . *or that it was real (People* v. *Ward* [(1948)] 84 Cal.App.2d 357, 360 [190 P.2d 972]). Any pistol, even a short one, may be a 'dangerous' weapon within the meaning of the statute *since it is capable of being used as a bludgeon.* (See *People* v. *Hood* ([1958]) 160 Cal.App.2d 121, 122 [324 P.2d 656].) *It is not necessary to show that defendant intended to use it. . . .* A jury may be instructed that if it finds that the gun was real, whether loaded or not, then the crime committed is robbery in the first degree. *If it finds that the gun was a toy, it may still find that the robbery is of the first degree if it determines from the circumstances that the toy gun could have been used as a club."* (63 Cal.2d at p. 532, italics added, some citations omitted.)

Thus, Justice Traynor made clear that an object which was not a real gun, such as a metal toy gun, qualified as a "dangerous weapon" if it "*could* have been used as a club."

Noteworthy in this discussion of "*dangerous* weapon" (in stark contrast to the discussion of "*deadly* weapon" within the meaning of section 3024) is the omission of "used or *intended* to be used as a club." It is omitted because, unlike § 3024, it is *absent* as a requirement of "*dangerous* weapon." (*People* v. *Ward* (1948) 84 Cal.App.2d 357 [190 P.2d 972] [A metal toy gun resembling a .32-caliber automatic is a "dangerous weapon."]; *People* v. *Coleman* (1942) 53 Cal.App.2d 18, 29 [127 P.2d 309] [A toy pistol resembling a .45-caliber pistol is a "dangerous weapon."]; *People* v. *Hood* (1958) 160 Cal.App.2d 121, 122 [324 P.2d 656] ["A kit of tools . . . ; an unloaded gun . . . ; or a toy gun . . . may be a 'dangerous' weapon within the meaning of the statute because capable of being used as a bludgeon or club."]; see also *People* v. *Nelums* (1982) 31 Cal.3d 355, 359 [182 Cal.Rptr. 515, 644 P.2d 201] [an *inoperable* gun may be a "firearm" within the meaning of sections 12022, subd. (a) and 12022.5. Such a weapon creates "substantial risks of harm by a resisting victim or third person . . . ."]; *People* v. *Bland* (1995) 10 Cal.4th 991, 1005 [43 Cal.Rptr.2d 77, 898 P.2d 391] [". . . an inoperable gun still creates a risk of harm because its passive display 'may stimulate resistance' "].)

*People* v. *Reid* misread and misstated *Aranda.*

*Reid*, apparently unaware *Aranda* separately considered two disparate weapons statutes, states: "The court in *Aranda* held that a toy pistol could

not be considered deadly or dangerous unless the toy was made of metal *and* was *used* or *intended to be used* as a club. ([*Aranda., supra,*] at p. 533.) The court in *Aranda* was interpreting former Penal Code section 3024, subdivisions (b) and (f). These sections provided that a person with a prior felony conviction is subject to a minimum sentence of four years if at the time of the offense he or she was armed with a deadly weapon. Deadly weapon was defined to include 'any . . . pistol, revolver, or any other firearm . . . and any metal pipe or bar used or intended to be used as a club.' (*Id.,* at p. 533.)

"While not discussing the effect of the use of a toy pistol in a Penal Code section 12022, subdivision (b) enhancement, the Supreme Court's discussion of when a toy gun may be considered deadly is pertinent here." (*People* v. *Reid, supra,* 133 Cal.App.3d 354, 366, original italics.)

Thus, *Reid* wrongly indicates *Aranda* was concerned with a "deadly weapon" when considering degree of robbery on the cited page 533. In fact, *Aranda* was then solely concerned with "dangerous weapon." Similarly, *Reid* seems unaware that in discussing section 3024 *Aranda* was not concerned with "dangerous weapon" but only "deadly weapon."

By errantly combining separate discussions of disparate statutes, *Reid* ascribes to *Aranda* a holding opposite to its actual holding.

The majority, by uncritically adopting *Reid*'s construction of *Aranda*, are in error.

The petitions of both respondent and appellant for review by the Supreme Court were denied February 26, 1997.