[No. A106781. First Dist., Div. Five. July 22, 2005.]

In re BARTHOLOMEW D., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
BARTHOLOMEW D., Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

## COUNSEL

Jonathan D. Soglin, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Martin S. Kaye and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

JONES, P. J.—Bartholomew D. appeals a dispositional order committing him to the California Youth Authority (CYA) after the juvenile court found he committed a robbery and personally used a deadly or dangerous weapon (BB gun) in the commission of that felony. (Pen. Code, §§ 211, 12022, subd. (b).)[1] In the published portion of the opinion, we address appellant's contention that evidence of his use of a BB gun is insufficient to support the finding of personal use of a dangerous weapon under section 12022, subdivision (b). In the unpublished portion, we agree with appellant's contention that his pre-committment custody credits must be recalculated.

### BACKGROUND

#### The Offense

The victim delivered pizzas for a pizzeria. On the night of the robbery, a young male voice placed a telephone order for two pizzas to be delivered to 415 West Merle Court.

When the victim arrived with the pizzas at 415 West Merle Court, appellant was standing at the front of the driveway. He informed the victim that the house he was looking for was in the back and accompanied the victim down the driveway. At the rear of the driveway, appellant pointed what appeared to be a shiny silver semiautomatic handgun at the victim's head, demanded his money, and ordered him to drop everything. The victim

---

[1] Unless otherwise indicated, all statutory references are to the Penal Code.

dropped the pizzas on the driveway and gave appellant his money. Appellant told the victim to leave. Just as the victim got to his car, appellant demanded his cell phone. The victim threw the phone to appellant and drove back to the pizzeria.

Before the victim arrived back at the pizzeria, the same caller who had placed the order telephoned the pizzeria again to say his order had not yet been delivered. The receptionist told him she would try to contact the deliveryman. She never did so because two minutes after she took the call saying the pizzas had not yet been delivered, the victim entered the pizzeria and said he had just had a gun shoved in his face. He and the receptionist contacted the police. Upon their arrival at the pizzeria, the police instructed the receptionist to telephone the number from which the order had been placed and say she was sending a free pizza. The receptionist spoke to the same caller who had placed the order. He directed her to have the pizza delivered to 435 West Merle Court instead of 415 West Merle Court.

The police went to 435 West Merle Court and rang the bell. Appellant's mother answered the door and consented to a search of the house. In appellant's bedroom, the police recovered a receipt for the pizzas that had been ordered for 415 West Merle Court. They also seized a black BB gun from the television stand in appellant's bedroom. At trial, the victim was unable to identify the BB gun as the gun used in the robbery.

Appellant presented an alibi defense. He denied being the robber and denied owning a gun. He said the BB gun found in his bedroom belonged to a friend who was paying him to fix it. He acknowledged he had never before fixed a gun.

### Proceedings

The juvenile court sustained the juvenile wardship petition (Welf. & Inst. Code § 602) following a contested hearing. It committed appellant to CYA for a maximum confinement of 6 years 10 months, less 38 days of custody credit, with commitment stayed pending placement review.

## DISCUSSION

### I. *Substantial Evidence a BB Gun Is a Dangerous Weapon*

Appellant does not challenge the robbery finding, nor does he now claim that he did not use a BB gun during the commission of the robbery. He contends there is insufficient evidence to support the finding that the particular BB gun he used was a deadly or dangerous weapon, within the meaning of section 12022, subdivision (b).

■ When a defendant claims insufficient evidence to support a finding, the appellate court "must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738].) We presume the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Lewis* (1990) 50 Cal.3d 262, 277 [266 Cal.Rptr. 834, 786 P.2d 892].) The same standard of review applies to claims of insufficient evidence by a juvenile criminal defendant. (See *In re Jerry M.* (1997) 59 Cal.App.4th 289, 298 [69 Cal.Rptr.2d 148].)

■ Section 12022, subdivision (b), states, in pertinent part: "Any person who personally uses a deadly or dangerous weapon in the commission of a felony . . . shall be punished by an additional and consecutive term of imprisonment in the state prison for one year . . . ." The statute does not define "deadly or dangerous weapon." To find a section 12022, subdivision (b) allegation true, the fact finder must conclude that the defendant himself intentionally displayed an instrument capable of inflicting great bodily injury or death in a menacing manner during the crime. (*People v. Wims* (1995) 10 Cal.4th 293, 302 [41 Cal.Rptr.2d 241, 895 P.2d 77].)

Cases have historically recognized a pellet gun as a dangerous weapon in the context of penal statutes in which proof that the perpetrator was "armed with a dangerous weapon" is an element of the crime. Under former section 211a, for example, conviction of first degree robbery required the robbery to be perpetrated by a person armed with a dangerous or deadly weapon.[2] *People v. Sherman* (1967) 251 Cal.App.2d 849 [60 Cal.Rptr. 198] affirmed a conviction of first degree robbery, rejecting the defendant's argument that no evidence was presented that the pellet gun used in the robbery, which the victim had described as resembling a German Luger, constituted a deadly weapon. "[T]he evidence shows, and defendant conceded, that the gun was a 'dangerous weapon' . . . . The words 'dangerous or deadly' are used disjunctively. 'Thus, it is not necessary to show that the weapon is deadly so long as it can be shown that it is dangerous. [Citation.]' [Citation.] Any gun, even a short one, may be a 'dangerous weapon' within the meaning of the statute since it is capable of being used as a bludgeon . . . . A metal gun the size and shape of [the pellet gun used in the robbery], which has the appearance of a Luger, is sufficient to constitute a 'dangerous weapon' within the meaning" of former section 211a. (*Sherman, supra*, at pp. 856–857, citations omitted.)

---

[2] Section 211a was repealed in 1986 (Stats. 1986, ch. 1428, § 1, p. 5123), and "dangerous or deadly weapon" no longer determines the degree of robbery, now specified in section 212.5.

In *People v. Burns* (1969) 270 Cal.App.2d 238 [75 Cal.Rptr. 688], the defendant was charged in the accusatory pleading with an arming enhancement under former section 3024. The jury found the defendant guilty of first degree robbery but found he was not armed with a *deadly* weapon in the commission of the offense, as required to prove the section 3024 enhancement. (*Burns, supra,* at pp. 253–254.) *Burns* concluded there was no inconsistency in the verdict. "At the time defendant was arrested a pellet gun was found in the car. [The victim] identified this gun as the robbery weapon. Accordingly, under the state of the evidence the jury could conclude that this gun was used in the robbery and that it was a dangerous weapon. Proof that the robber was armed with a gun that could be a dangerous weapon would support a conviction of robbery of the first degree. This is true even though it would not establish that he was armed with a 'deadly weapon.' " (*Id.* at p. 254.)

In *People v. Graham* (1969) 71 Cal.2d 303 [78 Cal.Rptr. 217, 455 P.2d 153], the defendant kicked the robbery victim, and the issue was whether a shoe was a dangerous weapon within the meaning of former section 211a. Citing *People v. Raleigh* (*People v. Raleigh* (1932) 128 Cal.App. 105 [16 P.2d 752]), *Graham* distinguished between two classes of "dangerous or deadly weapons" for purposes of the statute. " '. . . There are, first, those instrumentalities which are weapons in the strict sense of the word, and, second, those instrumentalities which are not weapons in the strict sense of the word, but which may be used as such. The instrumentalities falling in the first class, such as guns, dirks and blackjacks, which are weapons in the strict sense of the word and are "dangerous or deadly" to others in the ordinary use for which they are designed, may be said as a matter of law to be "dangerous or deadly weapons." This is true as the ordinary use for which they are designed establishes their character as such. The instrumentalities falling into the second class, such as ordinary razors, pocket-knives, hatpins, canes, hammers, hatchets and other sharp or heavy objects, which are not weapons in the strict sense of the word and are not "dangerous or deadly" to others in the ordinary use for which they are designed, may not be said as a matter of law to be "dangerous or deadly weapons." When it appears, however, that an instrumentality other than one falling within the first class is capable of being used in a "dangerous or deadly" manner, and it may be fairly inferred from the evidence that its possessor intended on a particular occasion to use it as a weapon should the circumstances require, we believe that its character as a "dangerous or deadly weapon" may be thus established, at least for the purposes of that occasion.' [Citation.]" (*Graham, supra,* at pp. 327–328.)

Subsequent cases have relied on *Sherman, Burns,* and *Graham* in analyzing challenges to a section 12022, subdivision (b) enhancement. In *People v. Montalvo* (1981) 117 Cal.App.3d 790 [173 Cal.Rptr. 51], the jury found true the section 12022, subdivision (b) allegation that the defendant used a

dangerous weapon—a pellet gun—in a robbery. (*Montalvo, supra,* at pp. 792, 796.) Although it reversed on unrelated grounds, *Montalvo* rejected the defendant's contention that his sentence was improperly enhanced. Based on the *Burns* and *Sherman* holdings that a pellet gun "is in fact a dangerous weapon," *Montalvo* concluded, without further analysis, that a section 12022, subdivision (b) enhancement based on use of a pellet gun was proper. (*Montalvo, supra,* at p. 797.)

In *People v. Schaefer* (1993) 18 Cal.App.4th 950 [22 Cal.Rptr.2d 536], the defendant admitted a section 12022.5, subdivision (a) enhancement—use of a firearm—during a robbery, based on his use of a pellet gun. *Schaefer* agreed the enhancement could not stand because the Legislature subsequently removed "pellet gun" from the statutory definition of "firearm." (*Schaefer, supra,* at p. 951.) Nevertheless, relying on *Montalvo*'s holding that a pellet gun was a dangerous or deadly weapon under section 12022, subdivision (b), *Schaefer* concluded the defendant's admission of the section 12022.5, subdivision (a) enhancement necessarily included an admission of a section 12022, subdivision (b) enhancement, and modified his conviction accordingly. (*Schaefer, supra,* at pp. 951, 952.)

In *People v. Reid* (1982) 133 Cal.App.3d 354 [184 Cal.Rptr. 186], the defendant used a toy gun, made of metal with a plastic grip, in a robbery. (*Id.* at p. 364.) He contended his section 12022, subdivision (b) enhancement should be stricken because there was no evidence he intended to use the toy gun as a club. (*Reid, supra,* at p. 364.) In resolving the issue, *Reid* applied the "dangerous or deadly weapon" distinction to section 12022, subdivision (b), that *Graham, supra,* 71 Cal.2d 303 had applied to former section 211a. It analyzed instrumentalities that are weapons in the strict sense of the word differently from instrumentalities that are not strictly weapons but are capable of use as such, when coupled with evidence the user intended that the instrumentality could be so used. It concluded a toy gun fell in the second category because it was "clear[ly]" not a weapon in the strict sense. (*Reid, supra,* at p. 367.) It struck the enhancement because, although the toy gun was capable of being used in a dangerous manner, i.e., as a club, there was insufficient evidence that the defendant intended to do so. (*Ibid.*)

Similarly, *People v. Godwin* (1996) 50 Cal.App.4th 1562, 1574 [58 Cal.Rptr.2d 545], struck an enhancement in which the instrumentality used during a robbery was a starter pistol because there was insufficient evidence to support the finding. It observed that the capacity of a starter pistol to inflict injury is not a matter of common knowledge, and there was no evidence regarding the starter pistol's capacities as a dangerous weapon, so as to be a dangerous weapon as a matter of law, i.e., a weapon in *Graham*'s "strict sense of the word" category. (*Godwin, supra,* at p. 1574.) Nor was there

evidence that the defendant intended to use it as a bludgeon, although it could have been so used. (*Id.* at p. 1574.)

In *In re Arturo H.* (1996) 42 Cal.App.4th 1694 [51 Cal.Rptr.2d 5], the defendant was found to have possessed a pellet gun on school grounds, a violation of section 626.10, which specifically proscribes possession of "any instrument that expels a metallic projectile such as a BB or a pellet, through the force of air pressure, CO[2] pressure, or spring action . . ." Defendant argued the finding must be reversed because there was no evidence his gun was *operable*. He reasoned that by defining the prohibited instrumentality in functional terms, the statute referred only to operable pellet guns. *Arturo H.* disagreed. It first noted the many cases that have interpreted the laws prohibiting firearms as applying to inoperable as well operable firearms, given the underlying purpose of the Dangerous Weapons Control Law (§ 12000 et seq., including § 12022, subd. (b)) to deter the danger that derives not only from the weapon, but also from the defensive reaction of people to the weapon. (*Arturo H., supra,* at pp. 1697, 1698.) It then concluded that the same rationale applies to pellet guns, "which are reasonably perceived as dangerous weapons capable of inflicting serious injury." (*Arturo H., supra,* 42 Cal.App.4th at p. 1698, citing *Schaefer, supra,* 18 Cal.App.4th 950, *Montalvo, supra,* 117 Cal.App.3d 790, and *Sherman, supra,* 251 Cal.App.2d 849.)

■ Unlike *Arturo H.,* we interpret here an enhancement statute that contains no definition of the "deadly or dangerous weapons[s]" which will trigger its application. The Dangerous Weapons Control Law (§ 12000 et seq.) defines BB guns for purposes of sections 12551 and 12552 (prohibiting the sale or furnishing of any BB device to minors), as "any instrument that expels a projectile, such as a BB or a pellet, . . . through the force of air pressure, gas pressure, or spring action, or any spot marker gun." (§ 12001, subd. (g).) The definition comports with the general definition of a BB gun: "a smooth bore air gun actuated by a spring loaded plunger that upon release from the cocked position compresses the air behind the pellet and propels it from the tube." (Webster's 3d New Internat. Dict. (2002) p. 189.) Although the Dangerous Weapons Control Law does not specifically apply its section 12001, subdivision (g), definition of "BB device" to "dangerous weapon[s]" referred to in section 12022, subdivision (b), the policy considerations supporting criminalizing the possession of BB guns and pellet guns on school grounds, or the sale of BB or pellet guns to minors, would in our view likewise support characterizing pellet guns as "dangerous weapon[s]" as that term in used in section 12022, subdivision (b).

The legislative history related to the 1993 amendment of section 626.10 (the statute at issue in *Arturo H.*), which added to its subdivision (a) the prohibition of "any instrument that expels a metallic projectile such as a BB

or a pellet . . . or any spot marker gun" on school grounds (Stats. 1993, ch. 599, § 2, p. 3151), reflects these policy considerations. The amendment was introduced as Senate Bill No. 647. Its accompanying analysis states that "[t]he purpose of this measure is to prevent the introduction of weapon-like instruments on the campuses of public elementary and high schools because of their capacity for creating disruption, apprehension, [and] physical injury . . . . [¶] . . . [¶] . . . BB guns . . . have an inherent capacity for physical injury. . . ." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 647 (1993–1994 Reg. Sess.) as amended Apr. 28, 1994.) These statutes proscribing pellet guns on school campuses, as well as the sale of pellet guns to minors, reflect a legislative recognition that the inherently dangerous nature of these instruments justifies the imposition of criminal penalties.

    ■   Considering the two classes of "dangerous weapons or deadly weapons" articulated by our Supreme Court in *Graham* (*People v. Graham, supra,* 71 Cal.2d at p. 327), we conclude a pellet gun falls into the first. It is a "weapon" in the strict sense of the word. We are convinced that a pellet gun is a dangerous weapon under section 12022, subdivision (b), as a matter of law because it is dangerous to others in the ordinary use for which it was designed. Unlike a toy gun, which is designed for play and is incapable of shooting a projectile, or a starter pistol, which is not designed to release a projectile but to make a loud noise to signal the beginning of a race, a BB gun is not an imitation gun. It is an instrument designed to shoot by expelling a metal projectile at a target, is commonly recognized as such, and thus, as *Arturo H.* observes, is reasonably perceived as capable of inflicting serious injury. (*In re Arturo H., supra,* 42 Cal.App.4th at p. 1698.)[3] Indeed, the victim here perceived the instrumentality as "a semiautomatic handgun." He testified he was certain it was a handgun; that it was semiautomatic and not a revolver. It was without question a real gun. And, in fact its appearance provoked the desired reaction: submission to appellant's criminal enterprise and demands. In short, the BB gun wielded by appellant was by design a weapon, and its use to expel a projectile supports the section 12022, subdivision (b) enhancement, even in the absence of evidence of its capacity to be used in a dangerous manner.

---

[3] Appellant was alleged, in the alternative, to have used a firearm (§ 12022.53, subd. (b)) or a dangerous or deadly weapon (§ 12022, subd. (b)). During closing argument his attorney argued there was "no deadly weapon was found on [appellant] . . . or on [his] premises. What was seized was a BB gun, which certainly doesn't fall within the statute for a deadly weapon." The prosecutor agreed there was insufficient evidence of firearm use for purposes of section 12022.53, subdivision (b), but argued that a true finding under section 12022, subdivision (b), "doesn't require a firearm. It could be any weapon. It could be a rock, it could be a bat, it could be a BB gun. A BB gun would qualify as a deadly or dangerous weapon." Appellant's counsel made no attempt to rebut this prosecution argument.

Appellant argues there was insufficient evidence that the BB gun used in this case was capable of inflicting great bodily injury. The gun was introduced into evidence. Markings on the gun included its caliber, "BB Cal (4.5mm) .177/Cal.," and model name, "Marksman Repeater." No evidence was presented regarding the velocity with which the BB's could be expelled from the gun, the material or shape of the BB's used in the gun, or the velocity necessary for a BB, in general, to produce injury. Relying primarily on *People v. Lochtefeld* (2000) 77 Cal.App.4th 533 [91 Cal.Rptr.2d 778] (*Lochtefeld*), appellant argues that without such evidence the capacity of this particular gun to injure could not be determined.

In *Lochtefeld*, the defendant was convicted of section 245, subdivision (c): assault on a peace officer " '*with a deadly weapon or instrument, other than a firearm.*' " (*Lochtefeld, supra*, 77 Cal.App.4th at p. 535, original italics.) After noting the expert trial testimony that the pellet gun at issue could expel pellets at sufficient speed to penetrate muscle tissue or an eyeball from a significant distance, *Lochtefeld* concluded the jury was entitled to find, on that evidence, that the gun was a weapon capable of inflicting great bodily injury. Therefore, *Lochtefeld* held, it was a deadly weapon for purposes of section 245 as a matter of law. (*Lochtefeld, supra*, at p. 541.)

*Lochtefeld* does not assist appellant. First, it emphasizes at the outset that a pellet gun has been found to be a deadly or dangerous weapon in the context of other penal statutes, specifically section 12022, subdivision (b), and in no way implies criticism of such a finding. (*Lochtefeld, supra*, 77 Cal.App.4th at p. 535.) Second, it does not establish an evidentiary threshold for proof of a weapon's capability to injure. In any case, evidence of the *Lochtefeld* weapon's capabilities was of greater significance in that case because, under section 245, there must be a finding the weapon was "deadly," not, as under section 12022, subdivision (b), "deadly *or* dangerous."

■ Additionally, *Lochtefeld* had to determine, for purposes of conviction of section 245, whether the pellet gun had a *present* ability to injure, which, under section 245, means it was operable. (*Lochtefeld, supra*, 77 Cal.App.4th at pp. 541–542.) A "true" finding under section 12022 does not require that the weapon necessarily operated. (See *People v. Nelums* (1982) 31 Cal.3d 355, 357 [182 Cal.Rptr. 515, 644 P.2d 201].)

II. *Custody Credits*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . .

[*]See footnote, *ante*, page 317.

## DISPOSITION

The orders sustaining the petition and committing appellant to CYA are affirmed. The case is remanded to the juvenile court with directions to (1) calculate the amount of precommitment custody credit to which appellant is entitled; (2) prepare an amended commitment order reflecting such credit; and (3) forward a certified copy of the amended commitment order to CYA or, if applicable, appellant's alternate placement.

Simons, J., and Gemello, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 2, 2005.