62 Cal.Rptr.3d 907 (2007)
153 Cal.App.4th 1043
In re Peter George COOPER, on Habeas Corpus.
No. A116437.
Court of Appeal of California, First District, Division Two.
July 27, 2007.
*908 Rogers Joseph O'Donnell, William Bennett Turner, San Francisco, Under appointment by the Court of Appeal, for Petitioner Peter George Cooper.
Edmund G. Brown, Jr., Attorney General of the State of California, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Anya M. Binsacca, Supervising Deputy Attorney General, Amber N. Wipfler, Deputy Attorney General, for Respondent Governor Arnold Schwarzenegger.
LAMBDEN, J.
On February 16, 2006, the Board of Prison Terms (Board) found Peter George Cooper suitable for release on parole. Cooper was serving an indeterminate prison term of 16 years to life for his conviction of second degree murder with use of a deadly weapon (Pen.Code, §§ 187, 12022, subdivision (b)). He entered prison on July 16, 1987, and his minimum eligible parole date was July 24, 2001. Governor Arnold Schwarzenegger reversed the Board's grant of parole, finding that the commitment offense was particularly heinous, leading him to conclude that Cooper's present release posed an unreasonable public safety risk.
Cooper filed a petition for writ of habeas corpus in this court, requesting that we reinstate the Board's grant of parole. We issued an order to show cause, and appointed counsel for Cooper. We conclude that some evidence did not support the Governor's decision to reverse the Board's grant of parole. (See, e.g., In re Rosenkrantz (2002) 29 Cal.4th 616, 677, 128 Cal. Rptr.2d 104, 59 P.3d 174 (Rosenkrantz).) Additionally, the Attorney General concedes that it cannot specify what documents were actually reviewed by the Governor. This admission raises serious due process questions. However, since we have the entire record before the Board and our review of this record indicates that there is no evidence to support a decision other than the one reached by the Board, a *909 remand to the Governor in this case would be pointless. We therefore grant Cooper's petition for habeas corpus relief and reinstate his Board's grant of parole.

BACKGROUND

Commitment Offense
After graduating from a university with a four-year degree in 1978, Cooper worked in computer applications and systems programming. From 1985 until his arrest in November 1986, Cooper was self-employed as an independent consultant.
In 1981, Cooper developed a drinking problem, which worsened over the next couple of years. During the summer of 1984, he attended Alcoholics Anonymous (AA) meetings and entered a 30-day residential program at a San Francisco hospital.
Cooper again began drinking and, in February 1985, he was convicted of drunk driving for driving with blood alcohol of 0.26 percent. Cooper was placed on three years probation. He completed the First Offender Program and paid his fine.
In June 1986, Cooper married Joan Harwitt (Joan). About one month later, on July 20, Cooper suffered a seizure at his home. This seizure was caused by his attempt to detoxify without any medical supervision after a period of especially heavy drinking. Cooper was admonished that another seizure could be fatal.
Cooper quit drinking and, after six days as an inpatient, entered the hospital's outpatient rehabilitation program. The four-day-a-week program included counseling, stress management sessions, and family sessions, which included Joan. Cooper also attended AA meetings.
On November 16, 1986, Cooper and Joan were in the kitchen of their home; Joan asked him to hug her. He stroked her back; she responded by asking him if he wanted to go upstairs to bed. He tensely responded, "No, absolutely not." Cooper noticed Joan's eyes tear and he left the kitchen and went upstairs to his office. He returned to the kitchen about 15 or 20 minutes later and stated that he would work on some shelves for the garage. Both Joan and Cooper went to the garage. He propped open the door between the garage and den with a 48-ounce sledgehammer, which he had removed from a closet.
After some discussion, Cooper and Joan returned inside the house and Cooper picked up the sledgehammer. Joan came up behind him and the two embraced. As they hugged, Joan became aroused and began fondling him. He asked her to stop, which angered her. She pushed away and yelled at him that he did not want her. She asked him if he would ever "be a man" to her again. Joan blamed Cooper's alcoholism treatment on his sexual problems and began to berate him and complain about his lack of sexual intimacy. She asked him if he needed a "bottle to want to fuck" her. She yelled at him that he was not a man and that he was "nothing but a rubber dick queer." Joan continued: "You've known all along you were a queer, your mother told you, you were a queer.... You're nothing but a limp dick, your mother told you, you are a queer and I should tell your mother she was right." Joan's yelling went on for about 10 minutes. Cooper had his back to the garage door and Joan paced up and down in front of him.
Cooper became angry when Joan called him a "queer," but he asserted that Joan's threat to tell his mother was "catastrophic." He became enraged and fearful that she might tell his mother. He began to scream back and told her that he was not going to take it anymore. Joan proceeded *910 to tell him: "Why don't you just go out and get a queer little boy just like you. Why don't you go out and get a queer little boy and suck it off?"
As Joan paced towards the den, Cooper rushed behind her carrying the sledgehammer and, with a swinging downward blow to the back of her head and neck, knocked her down with the sledgehammer. While Joan remained on the ground, Cooper went up to her and struck her neck with the sledgehammer five or six times.
Cooper dropped the sledgehammer and ran upstairs. After he regained his composure, he returned downstairs. He examined Joan and concluded she was dead.
An autopsy established that Joan died of spinal shock from blunt trauma injuries to the back of the neck. She also had a bruise in the pubic region consistent with being kicked or hit there. She also had bruises to her head and chin. She lived for up to 20 or 30 minutes after suffering the injuries and might have survived with immediate medical attention.
Cooper placed Joan's body, purse, and eyeglasses into the trunk of her car and drove to the airport. He left the car in the airport parking garage after wiping his fingerprints off the steering wheel. He took a cab to a hospital and then took another cab home from the hospital.
Once Cooper returned home, he cleaned the bloodstain off the den carpet. Later he removed the portion of the carpet that had the bloodstain and replaced it. He covered the replaced carpet with a sofa.
The following evening, on November 17, 1986, Cooper reported to the police that Joan had not returned from a shopping trip. Cooper told friends and Joan's family essentially the same story. After a number of interviews with the police over the course of a few days, Cooper confessed to the killing on November 21.

The Trials, Convictions, and Appeals
A jury convicted Cooper of second degree murder, and he appealed from the judgment. In a nonpublished decision we vacated the judgment because the trial judge had prejudicially responded to jury questions about manslaughter and murder without the presence of either party's counsel.
A second jury trial resulted in a verdict of guilt for second degree murder (§ 187) of Cooper's wife. The jury also found true allegations of deadly weapon use (a sledgehammer) and great bodily injury (§§ 12022, subd. (b), 1203.75, subd. (a)(1)). The trial court sentenced defendant to 15 years to life plus a one-year enhancement for use of a deadly weapon. Cooper appealed and we affirmed in a nonpublished decision.

In-Prison Behavior
During the entire time he has been incarcerated, Cooper has not received any violation reports, either serious or administrative. He has attended AA meetings and a number of other self-help groups, such as stress management, anger management, and breaking barriers. Cooper has the lowest custody classification permitted for prisoners with a life term.
The Governor summarized Cooper's behavior while incarcerated as follows: Cooper "has made efforts to enhance his ability to function within the law upon release. He has upgraded vocationally, gaining and sharpening marketable skills, in particular in the fields of Radiological Technologist, X-Ray Technician, Nursery Operator, Landscaping and Horticulture, Silk Screen, and Grading/Marketing Training. He has held skilled jobs within the institutional setting and has participated in Hospice Volunteer Training, Blind Project, and *911 the Pastoral Care Services Program, among others, receiving positive reports from institutional staff. He has availed himself of an array of self-help and therapy, including Understanding and Handling Addiction, AngerCreating New Choices, Breaking Barriers, CriminonThe Way to Happiness, Friend Outside, Creative Conflict Resolution/Anger Management Workshop, IMPACT Workshop, Alcoholics Anonymous, Narcotics Anonymous, V.O.L.T., Victim/Offender Reconciliation Group, The Complete Idiot's Guide to Managing Stress, Men's Violence Prevention Seminar, Impact of Victims of Crime, Stress Management, Conflict Resolution, Parenting Skills, Values Clarification Workshops. Likewise, he has received favorable evaluations from various correctional and mental-health professionals and has made realistic, confirmed parole plans that include housing options, substance-abuse-prevention support, and a lined-up job interview...."

Board Hearing in 2006
On February 16, 2006, Cooper represented himself at his hearing before Presiding Commissioner Tracey St. Julien and Deputy Commissioner Bruce Mitchell. The Board considered Cooper's score of 80 on the Global Assessment and Functioning Scale. The scores on this scale range from 1 to 100; a score in the 80 or 90 range indicates that the person is "functioning quite well with the general population" and the person gets along with others. The psychological report considered by the Board described Cooper's current mental status and treatment needs as follows: "Currently, the Inmate does not have any severe mental pathology. His mental status is within normal limits, and there's no psychosis." With respect to Cooper's appreciation of the crime he committed, the report also stated that Cooper has "a high degree of insight and very well developed sense of empathy towards the victim, as well as an appropriate remorse for what has happened."
The only letter in opposition to Cooper's parole was a form letter from an acting police chief of the City of San Mateo. The district attorney, trial judge, and victim's family provided no letters in opposition.
Cooper prepared a "Lifer Memorandum Packet" (Lifer Memo) that addressed his crime, his remorse, other aspects of Cooper's institutional behavior, and Cooper's parole plans. With regard to his parole plans, Cooper presented letters from his family and friends indicating he had an extensive support network. His plan was to work part-time initially as an X-ray technician and then to take his state certification tests in computer tomography and magnetic resonance imaging. Cooper stated that he planned to obtain a masters of science in medical physics and then work in radiology and oncology as a medical physicist.
At the beginning of the hearing, Cooper mentioned an issue of concern that had been raised at the conclusion of his prior parole hearing in 2004. Cooper stated a commissioner at his 2004 hearing found that Cooper likes to be in control of a situation. Cooper believed this conclusion was based on an earlier statement by the district attorney that had been discussed at his 2002 parole hearing and on Cooper's body language at the 2004 parole hearing.[1] *912 Cooper expressed concern that he did not know how to respond to the commissioner's comment about his body language. Deputy Commissioner Mitchell responded that the current Board members were not at the prior hearings and, although they would consider the earlier comments, they were specifically concerned with Cooper's responses to questions at the current hearing. When Cooper was asked how he thought his demeanor was perceived at the prior hearing, he said: "Well, I think that'sI think that's part of my point. I'mI perceive my demeanordemeanor to be like. `Gee, I wish this was over because I really need to get these handcuffs off,' okay? And I think I said something to my attorney as I left, you know, thatit wasn'twasn't caught onon tape, but I wasI was pretty exhausted and in pain by the time thethe hearing was over."

The Board's Findings and Grant of Parole
Following the questioning of Cooper and the consideration of his testimony and the documents presented at the hearing, the two-person Board panel granted Cooper parole. The Board noted that it had seriously considered the "brutal murder" of Joan and the facts that Cooper did not seek medical aid for Joan after hitting her and that he placed her body in her car's trunk and left the car at the airport parking lot. The panel noted, however, that through Cooper's "years of incarceration [he had] rehabilitated" himself and that he "would no longer be a risk or a danger to public safety." The presiding commissioner stated that she would encourage and recommend that any review of this grant of parole "make sure that the prisoner's [Lifer Memo] that he had prepared is included in those materials."
The Board found that Cooper had rehabilitated himself, would no longer be a risk or a danger to public safety, had no juvenile record, and had a stable social history. It also concluded that he lacked a "significant criminal history of a violent nature, or of any other criminal nature, and because of maturation, growth, greater understanding and advanced age, he ha[d] a reduced probability of recidivism[,]" had "realistic parole plans[,]" and had "marketable skills[.]" It also found that he had shown signs of remorse, understood the nature and magnitude of the offense, and accepted responsibility for it.
The Board used its regulatory matrix for setting the base term and concluded that Cooper's crime was aggravated because of the opportunity to stop the crime and seek help for the victim, as well as the special relationship of confidence and trust with the victim. The Board determined a base term of 240 months and subtracted 72 months for post-conviction credits. The Board set his minimum eligible parole date of July 24, 2001.

Governor's Review and Reversal
On July 5, 2006, the Governor by letter provided notice that he was reversing the Board's decision. The Governor summarized Cooper's crime and noted his record of remaining discipline-free while incarcerated and his efforts to improve his skills and take self-help classes. The Governor provided the following explanation for his reversal: "But despite any factors tending to support Mr. Cooper's parole suitability at this time, the second degree murder he *913 perpetrated was especially heinous due to the brutality with which it was carried out and his efforts afterwards to conceal what he had done. Mr. Cooper beat his wife in the head multiple times with a sledgehammer, including, according to the Court of Appeal opinion, after she had fallen down. Following that, by his own admission at his 2006 parole hearing, he left her, alive and wounded, and went upstairs. When he returned and discovered Mrs. Cooper was dead, he tried to cover up what he had done by transporting and then dumping her body. According to Mr. Cooper's statements per the police report, he also cleaned the crime scene upon returning home. Mr. Cooper later reported his wife missing and concocted a story to police. While Mr. Cooper eventually admitted to police that he killed his wife, he went to great lengths initially to conceal it. The nature and circumstances of the second degree murder committed by Mr. Cooper are alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk.
"The 2004 Board, when finding Mr. Cooper unsuitable for parole, concluded `that he still is a man who wants to be in total charge, and when he is not it is very uncomfortable with him.' That same Board also concluded that Mr. Cooper lacked insight into his crime. At his 2006 parole hearing, Mr. Cooper told the Board that he accepts responsibility and is remorseful for his wife's murder. The 2006 Board stated that Mr. Cooper indicated that he understands the nature and magnitude of his crime and accepts responsibility for his actions."
The Governor concluded that, given the "current record before" him, and "after carefully considering the very same factors the Board must consider," he found "the gravity of the murder committed by Mr. Cooper presently outweighs any positive factors tending to support his parole suitability." He therefore found that Cooper's release would pose an unreasonable risk of danger to society at this time and reversed the Board's 2006 decision to grant parole to Cooper.

Habeas Corpus Proceedings
Cooper filed a petition for habeas corpus in the superior court, challenging the Governor's reversal of the Board's grant of parole. Without issuing an order to show cause or conducting any hearing, the superior court summarily denied the petition. On January 17, 2007, Cooper filed his habeas corpus petition in propria persona in this court, again challenging the Governor's decision.
We issued an order to show cause and appointed counsel for Cooper. Pursuant to our order to show cause, the Attorney General filed a return on April 18, 2007. The Attorney General attached five exhibits to the return, including the transcript of the entire Board hearing on February 16, 2006.
Counsel for Cooper moved to require the Attorney General to lodge with this court and serve on Cooper the entire administrative record that was actually reviewed by the Governor. We granted the motion and the Attorney General lodged what it represented to this court was the entire administrative record that was actually before the Governor. The record lodged with this court contained numerous documents such as, Cooper's work time cards, trust account transactions, and prison schedules. This record, however, did not include the first 116 pages of the transcript of the 2006 Board hearing, which was the entire evidentiary portion of the hearing. It also did not include the Lifer Memo.
*914 Cooper filed his traverse. He maintained that the Governor's decision violated his due process rights because the record before the Governor was insufficient. Cooper also argued that an independent basis for reversing the Governor's decision was that "some evidence" did not support the reversal of the Board's decision to grant parole.
We issued an order to have the Attorney General file a reply brief to respond to Cooper's due process argument and to the assertion that the record before the Governor was incomplete. The Attorney General filed a response asserting that it could not ascertain the exact record before the Governor.

DISCUSSION

I. The Statutory Framework and Judicial Review

"When considering parole for an indeterminate life inmate, the Board first determines suitability for parole. If it finds the inmate suitable, the Board establishes a parole release date. [Citations.] Conversely, if the Board concludes that public safety requires a lengthier period of incarceration, parole will be denied." (In re Burns (2006) 136 Cal.App.4th 1318, 1325, 40 Cal.Rptr.3d 1.) Penal Code section 3041, subdivision (a) reads: "One year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date as provided in [Penal Code] Section 3041.5. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The Board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime."
Subdivision (b) of Penal Code section 3041 provides in pertinent part, that "[t]he panel or the board sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."
The Board's parole decision is guided by regulations, which direct the Board to consider the following information: "All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Cal.Code *915 Regs., tit. 15, § 2402, subd. (b).)[2]
The regulations further direct the Board to consider six nonexclusive circumstances tending to show unsuitability (§ 2402, subd. (c)) and nine tending to show suitability (§ 2402, subd. (d)). (See also In re Scott (2004) 119 Cal.App.4th 871, 888, 897, 15 Cal.Rptr.3d 32 (Scott I).) Circumstances tending to show unsuitability include that the inmate: "(1) ... committed the offense in an especially heinous, atrocious or cruel manner." (§ 2402, subd. (c)(1).) In deciding whether the crime was particularly heinous, atrocious, or cruel the Board is to consider the following factors: "(A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (Id., subd. (c)(1)(A)-(E).)
Other circumstances tending to indicate unsuitability for parole are that the inmate possesses a previous record of violence, has an unstable social history, has previously sexually assaulted another individual in a sadistic manner, has a lengthy history of severe mental problems related to the offense, and has engaged in serious misconduct while in prison. (§ 2402, subd. (c)(2)-(6).)
Circumstances tending to show suitability for parole are that the inmate has no juvenile record, a stable social history, has shown signs of remorse, "committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time" (§ 2402, subd. (d)(4)), committed the offense as a result of battered woman syndrome, lacks any significant history of violent crime, is of an age that reduces the probability of recidivism, has made realistic plans for release, and has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (Id., subd. (d).)
The specified unsuitability and suitability factors are "general guidelines" only. (§ 2402, subds. (c), (d).) The Board is expected to consider "[a]ll relevant, reliable information available.... Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (Id., subd. (b).) "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Id, subd. (a).)
In Rosenkrantz, our Supreme Court held "that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by the statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas *916 corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (Rosenkrantz, supra, 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174, italics added; see also Scott I, supra, 119 Cal.App.4th 871, 15 Cal.Rptr.3d 32; In re Scott (2005) 133 Cal.App.4th 573, 34 Cal.Rptr.3d 905 (Scott II).)
By "some evidence," courts have explained that "[o]nly a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board].... [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision." (Rosenkrantz, supra, 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.)
A Governor's review of a Board suitability decision is constitutionally authorized but "subject to procedures provided by statute" (Cal. Const., art. V, § 8, subd. (b)). The Governor may review, and then affirm, modify or reverse the decision, "on the basis of the same factors which the parole authority is required to consider" and must issue a written statement of his or her reasons (ibid.; Pen.Code, § 3041.2, subd. (b)).
"Court review of a Governor's decision ensures, among other due process rights, that the decision be supported by some evidence, the same standard for reviewing Board decisions. `[T]he voters in adopting the constitutional provision placed substantive limitations upon the Governor's exercise of that judgment and discretion. The provision mandates that the Governor consider only the same factors that may be considered by the Board. Having chosen to review a parole decision, the Governor lacks discretion to disregard this requirement, which distinguishes the Governor's parole review authority from his authority to grant pardons and commutations. Because this requirement gives rise to a liberty interest protected by due process of law, and because due process of law requires that a decision considering such factors be supported by some evidence in the record, the Governor's decision is subject to judicial review to ensure compliance with this constitutional mandate.' (Rosenkrantz, supra, 29 Cal.4th at pp. 663-664[, 128 Cal.Rptr.2d 104, 59 P.3d 174].)" (In re Elkins (2006) 144 Cal. App.4th 475, 488-489, 50 Cal.Rptr.3d 503 (Elkins).)
While the Governor must consider the same circumstances as the Board, the Governor may weigh them differently and draw contrary conclusions. (Rosenkrantz, supra, 29 Cal.4th at pp. 669-670, 128 Cal. Rptr.2d 104, 59 P.3d 174; Elkins, supra, 144 Cal.App.4th at p. 489, 50 Cal.Rptr.3d 503.)
In denying relief in the present case, the court below did not conduct an evidentiary hearing. This is therefore an original proceeding in which we independently review the record. (Rosenkrantz, supra, 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.) However, resolution of any conflicts in the evidence and the weight to *917 be given the evidence are matters within the authority of the Governor. (Ibid.)

II. Reviewing the Governor's Decision for Some Evidence

When reviewing the Governor's decision, "[t]he test is not whether some evidence supports the reasons ... for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." (In re Lee (2006) 143 Cal.App.4th 1400, 1408, 49 Cal. Rptr.3d 931.) The Attorney General argues that we should discount the test set forth in Lee as well as in other cases (e.g., In re Weider (2006) 145 Cal.App.4th 570, 52 Cal.Rptr.3d 147), including our own decisions (e.g., Elkins, supra, 144 Cal. App.4th 475, 50 Cal.Rptr.3d 503), and apply the test of whether some evidence supports the Governor's reasons or findings. The Attorney General does not point to any Supreme Court case that has overruled the test set forth in Lee and Elkins. To the contrary, the Supreme Court denied review of Elkins and, on February 7, 2007, it also denied a request to depublish the case. Accordingly, we review the Governor's decision under the standard articulated in Lee and Elkins.
As set forth above, the circumstances tending to show parole unsuitability are that the inmate: committed the offense in an especially heinous, atrocious, or cruel manner; possesses a previous record of violence; has an unstable social history; has previously sexually assaulted another individual in a sadistic manner; has a lengthy history of severe mental problems related to the offense; and has engaged in serious misconduct while in prison. (§ 2402, subd. (c).) Here, the Governor concluded Cooper was unsuitable for parole based on the commitment offense. None of the other foregoing factors was mentioned by the Governor and a review of the record establishes that, other than the commitment offense, none of the unsuitability factors applies to Cooper's case.
Under section 2402, subdivision (b), the Board and Governor are also to consider the inmate's past and present attitude toward the crime when considering suitability for parole. The Attorney General contends that some evidence in the record supported the Governor's finding that Cooper lacked insight based on the evidence that Cooper lacked control and needed to be in charge.
We therefore consider whether "some evidence" in the record supports a finding that Cooper's release unreasonably endangers the public safety based on his lack of insight or on his commitment offense being carried out in a particularly cruel and callous manner.

A. Lack of Insight

In his decision to reverse the Board, the Governor mentioned a statement by the commissioner at Cooper's prior parole hearing in 2004 that Cooper was unsuitable for parole partially because he was a person "who wants to be in total charge, and when he is not it is very uncomfortable with him." The Governor also pointed out that the commissioners at the 2004 parole board hearing concluded that Cooper lacked insight into his crime. Although the Governor's reversal of the Board's decision did not seem to rely on the factors of a lack of insight and control, the Attorney General contends some evidence in the record supports a lack of insight or control and therefore we must sustain the Governor's reversal.
The Attorney General acknowledges that the 2006 Board found Cooper did understand the nature and magnitude of his crime but points out the Governor is not bound by this conclusion (see Rosenkrantz, supra, 29 Cal.4th at p. 679, 128 *918 Cal.Rptr.2d 104, 59 P.3d 174). We agree the Governor does not have to come to the same conclusions as the Board, but the Governor's decision must be supported by some evidence presented at the 2006 parole hearing. The Governor cited to no evidence before the 2006 Board that questions the Board's finding that Cooper had insight into the nature and magnitude of the crime. Indeed, the most current psychological evaluation of Cooper concluded that he had "a high degree of insight and very well developed sense of empathy towards the victim, as well as an appropriate remorse for what has happened." Additionally, Cooper's Lifer Memo addressed his remorse. The Board found, based on the entire record before it, that Cooper "shows signs of remorse" and "understands the nature and magnitude of the offense and accepts responsibility for [it]." Nothing in the record before the 2006 Board contradicts this finding.
With regard to Cooper's need to be in control, Cooper explained at the 2006 parole hearing that he had been uncomfortable at the prior hearing because he was in handcuffs. Deputy Commissioner Mitchell commented that the current Board was not present at the prior 2004 hearing and, although this Board would consider these earlier comments, the current Board would be specifically looking at how Cooper responded to questions at the 2006 hearing. Commissioner Mitchell and Presiding Commissioner St. Julien found nothing at the present hearing to indicate Cooper had to be in control. As noted above, the Governor merely mentioned comments from the 2004 hearing but pointed to no evidence presented at the 2006 hearing that indicated Cooper lacked insight or control.
The Governor's review of the Board's decision is "limited to a consideration of the record before the hearing panel." (In re Arafiles (1992) 6 Cal.App.4th 1467, 1477, 8 Cal.Rptr.2d 492; see also Rosenkrantz, supra, 29 Cal.4th at pp. 660-661, 128 Cal.Rptr.2d 104, 59 P.3d 174 [Governor's de novo review of the inmate's suitability for parole "is limited to the same considerations that inform the Board's decision"].) Evidence not before the Board cannot be relied upon by the Governor.[3] (In re Smith (2003) 109 Cal. App.4th 489, 505, 134 Cal.Rptr.2d 781 (Smith I); see also In re Gray (2007) 151 Cal.App.4th 379, 59 Cal.Rptr.3d 724.)
The record before the Board, which is identical to the record the Governor is to review, contained no evidence to support a finding that Cooper lacked insight into the commitment offense or lacked control. Accordingly, we conclude no evidence in the record supported the Governor's reversal based on lack of insight or control.

B. The Gravity of the Commitment Offense

As already noted, there are six factors that indicate unsuitability, and the only remaining factor that could be applied in the present case was the factor relied upon by the Governor, which is that the murder was committed in an especially heinous, atrocious, or cruel manner. To support a finding that the offense was committed "in an especially heinous, atrocious or cruel manner" there must be some evidence that the "violence and viciousness of the inmate's crime" is greater than that which is "minimally necessary to convict [the defendant] of the offense for which he is confined." (§ 2402, subd. (c)(1); In re *919 Dannenberg (2005) 34 Cal.4th 1061, 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783.) "[P]arole is the rule, rather than the exception, and a conviction for second degree murder does not automatically render one unsuitable." (In re Smith (2003) 114 Cal.App.4th 343, 366, 7 Cal.Rptr.3d 655 (Smith II).)
The court in In re Dannenberg clarified that, in finding an inmate unsuitable for parole, the Board may rely solely upon the circumstances of the crime. (In re Dannenberg, supra, 34 Cal.4th at p. 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783.) The court recognized, however, that reliance upon the circumstances of the prisoner's offense alone might contravene the inmate's constitutionally protected expectation of parole. The court explained: "[S]uch a violation could occur, `for example[,] where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.' [Citation.] ... [I]n order to prevent the parole authority's case-by-case suitability determinations from swallowing the rule that parole should `normally' be granted, an offense must be `particularly egregious' to justify the denial of parole." (Id. at pp. 1094-1095, 23 Cal.Rptr.3d 417, 104 P.3d 783.)
Similarly, we stressed in In re Scott II, supra, 133 Cal.App.4th 573, 34 Cal.Rptr.3d 905, the problems with relying exclusively on the commitment offense. (Id. at pp. 594-595, 34 Cal.Rptr.3d 905.) "Reliance on such an immutable factor `without regard to or consideration of subsequent circumstances' may be unfair [citation] and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' [Citation.] The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time." (Scott II, supra, 133 Cal.App.4th at p. 595, 34 Cal.Rptr.3d 905.)
The commitment offense in the present case is second degree murder. "Second degree murder is defined as the unlawful killing of a human being with malice aforethought, but without the additional elementsi.e., willfulness, premeditation, and deliberationthat would support a conviction of first degree murder." (People v. Nieto Benitez (1992) 4 Cal.4th 91, 102, 13 Cal.Rptr.2d 864, 840 P.2d 969, italics omitted.) Malice itself involves "`an element of viciousnessan extreme indifference to the value of human life.'" (People v. Summers (1983) 147 Cal.App.3d 180, 184, 195 Cal.Rptr. 21.) As has been previously noted, "`[A]ll second degree murders by definition involve some callousness i.e., lack of emotion or sympathy, emotional insensitivity, indifference to the feelings and suffering of others.'" (Scott I, supra, 119 Cal.App.4th at p. 891, 15 Cal.Rptr.3d 32; see also In re Weider, supra, 145 Cal.App.4th at p. 587, 52 Cal.Rptr.3d 147.) Thus, "the inquiry is whether among murders the one committed by [Cooper] was particularly heinous, atrocious or cruel." (In re Lee, supra, 143 Cal.App.4th at p. 1409, 49 Cal.Rptr.3d 931.)
Here, the Governor explained that he believed the second degree murder committed by Cooper "was especially heinous due to the brutality with which it was carried out and his efforts afterwards to conceal what he had done. Mr. Cooper beat his wife in the head multiple times with a sledgehammer, including, ... after she had fallen down. Following that, by his own admission at his 2006 parole hearing, he left her, alive and wounded, and went upstairs. When he returned and discovered *920 Mrs. Cooper was dead, he tried to cover up what he had done by transporting and then dumping her body. According to Mr. Cooper's statements per the police report, he also cleaned the crime scene upon returning home. Mr. Cooper later reported his wife missing and concocted a story to police. While Mr. Cooper eventually admitted to police that he killed his wife, he went to great lengths initially to conceal it. The nature and circumstances of the second degree murder committed by Mr. Cooper are alone sufficient for me to conclude presently that his release from prison would pose an unreasonable public-safety risk."
In deciding whether the crime was particularly heinous, atrocious, or cruel the Governor is to consider the following factors: "(A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (§ 2402, subd. (c)(1)(A)-(E).)
In the present case, the Governor appears to be relying on the factor that the offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering. None of the other foregoing factors applies to this case.
The Attorney General contends that Cooper's offense was carried out in a manner that demonstrates an exceptionally callous disregard for human suffering partially because of the brutality involved in Cooper's hitting his wife with a sledgehammer and his failure to stop after inflicting the first blow to her. The Attorney General stresses that Cooper admitted to continuing to hit his wife "even though she shut up after the first blow." Further, he left her alive when the forensic evidence established that immediate medical help might have saved her.
We have previously held that the Governor cannot rely on the fact that the killing could have been avoided to show the killing was especially brutal. (Elkins, supra, 144 Cal.App.4th at p. 497, 50 Cal.Rptr.3d 503; In re Barker (2007) 151 Cal.App.4th 346, 375, 59 Cal.Rptr.3d 746.) If Cooper had stopped after the first blow, no murder would have occurred. Similarly, if immediate medical attention had saved his wife, Cooper would not have been convicted of second degree murder. Thus, the fact that he did not stop, but carried out the crime, cannot be a factor that shows this killing was particularly brutal "[b]ecause it violates due process to deny parole '"where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense."'" (Elkins, supra, at p. 497, 50 Cal.Rptr.3d 503.)
The Attorney General asserts that the brutality in the present case is similar to that in In re Dannenberg, supra, 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783. The Dannenberg court held that the Board proceeded lawfully when it found Dannenberg unsuitable for parole "by pointing to some evidence that the particular circumstances of his crimecircumstances beyond the minimum elements of his convictionindicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety." (Id. at p. 1098, 23 Cal.Rptr.3d 417, 104 P.3d 783.) Dannenberg "struck multiple blows to his wife's head with a pipe wrench." (Id. at p. 1095, 23 Cal.Rptr.3d 417, 104 P.3d 783.) *921 While she was bleeding profusely, she either was pushed or she fell into a bathtub of water, where she drowned. (Ibid.) The court concluded, "Though he vehemently denied it, the evidence permitted an inference that, while the victim was helpless from her injuries, Dannenberg placed her head in the water, or at least left it there without assisting her until she was dead." (Ibid.)
The present case is distinguishable from In re Dannenberg, supra, 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783. Both cases involved the husband striking his wife with an object, but there are few other similarities. Cooper may have abandoned his wife after beating her, but he did not take the added step of placing his injured wife in water and drowning her or watching her drown. Further, unlike the situation in Dannenberg, the present case does not involve "trivial provocation." (Id. at p. 1098, 23 Cal.Rptr.3d 417, 104 P.3d 783.) Dannenberg hit his wife with a pipe wrench after she screamed at him that she wanted him dead and jabbed him with a screwdriver. (Id at pp. 1072-1073, 23 Cal. Rptr.3d 417, 104 P.3d 783.) In the present case, Cooper's wife yelled and taunted him for about 10 minutes about his inability to perform sexually now that he was not drinking and then screamed that he was a "queer." In contrast to Dannenberg, Cooper's violent response was triggered after his wife's taunting escalated and continued for about ten minutes. We are in no way suggesting that the taunts of Cooper's wife caused this terrible attack on her or that she was in any way responsible for what happened to her, but we are merely pointing out that Cooper did not immediately respond with violence to his wife's taunts. Moreover, unlike the situation in Dannenberg, where Dannenberg knew his wife would die if left in the water, there is no evidence that Cooper took any deliberate step to make sure his wife would die. There is no evidence that Cooper knew his wife was dying when he went upstairs.
Another factor demonstrating the cruelty and callousness, according to the Attorney General, was Cooper's attempts to conceal or cover-up the crime. This latter factor, however, is not related to the murder itself, and the attempt to cover-up a crime is common to almost all crimes. This issue was most recently addressed in In re Lawrence (2007) 150 Cal.App.4th 1511, 59 Cal.Rptr.3d 537. The court noted that the fact a person attempts to conceal his or her guilt and avoid prosecution does not establish this person has a greater risk of reoffending. (Id. at p. 1561, 59 Cal. Rptr.3d 537.) Unless the person is caught at the scene, it is rare for murderers to reject taking any steps to avoid prosecution. In the present case, Cooper did initially attempt to conceal the murder, but he did ultimately confess to the crime. Cooper's initial attempts to avoid prosecution considered with his confession days later do not make his crime particularly "heinous" and do not make him more likely to reoffend.
We agree that Cooper's crime was callous when he beat his wife with a sledgehammer. However, the facts of this case were no more callous than most such offenses and not beyond the minimum for malice aforethought. (See, e.g., Smith II, supra, 114 Cal.App.4th at p. 367, 7 Cal. Rptr.3d 655.)
Further, under Board regulations, the prisoner's "motivation" for the offense tends to show suitability when it was "the result of significant stress in his life, especially if the stress has built over a long period of time" (§ 2402, subd. (d)(4)). In this particular case, Cooper had suffered an alcoholic seizure in July 1986 and was told that another seizure could be fatal. He was attending AA meetings and participating *922 in counseling when the crime occurred on November 16,1986. His marital relationship was also creating stress partly as a result of his inability to perform sexually. Cooper told the probation officer in 1987 that "[i]n the very time period when Joan wanted me and pressured me the most, I had two jobs, a full-time commitment to a recovery program and very little sex drive." The probation officer's report prepared in June 1987 stated that Cooper's crime was committed "because of an unusual circumstance which is unlikely to recur."
The Governor's decision fails to mention or consider the significant stress in Cooper's life. The Governor was obligated to consider the significant stress Cooper was experiencing at and prior to the time he committed his offense. (See, e.g., Rosenkrantz, supra, 29 Cal.4th at p. 679, 128 Cal.Rptr.2d 104, 59 P.3d 174; Scott I, supra, 119 Cal.App.4th at p. 899, 15 Cal. Rptr.3d 32; Scott II, supra, 133 Cal. App.4th at p. 596, 34 Cal.Rptr.3d 905.) The Governor's failure to consider whether Cooper committed his offense "`as the result of significant stress in his life' is arbitrary and capricious in the sense that he failed to apply the controlling legal principles to the facts before him." (Scott II, supra, at p. 596, 34 Cal.Rptr.3d 905.)
Other circumstances establishing Cooper's suitability for parole are that he has no juvenile record, has shown signs of remorse, lacks any significant history of violent crime, is over the age of 50 and thus of an age that reduces the probability of recidivism, has made realistic plans for release, and has engaged in institutional activities that indicate an enhanced ability to function within the law upon his release. (§ 2402, subd. (d).) Indeed, Cooper has received no violation reports either serious or administrative while incarcerated and has availed himself of the opportunity to garner marketable skills.
On this record, we need not send the case back for the Governor's reconsideration to take into account the stress in Cooper's life, because of the absence of "some evidence" in the record establishing that the gravity of Cooper's offense shows him unsuitable for release. We conclude that given the remoteness of the commitment offense, the lack of any previous record of violence, Cooper's institutional behavior and accomplishments while incarcerated, his parole plans, his psychological evaluations, and the absence of any evidence that he is a current danger to society if released, there is no factual support whatsoever in the record before the Governor to reverse the Board's grant of parole to Cooper, Since the record before the Board in 2006 provides no evidence to support a decision other than the one reached by the Board and the Governor cannot augment the record before the Board, a remand to the Governor in this case would, as the Smith I court observed, "amount to an idle act." (Smith I, supra, 109 Cal.App.4th at p. 507, 134 Cal.Rptr.2d 781.)
Considering that the Governor's decision reversing the Board's grant of a parole release date to Cooper was not made in accordance with applicable legal principles and not supported by some evidence, that reversal cannot stand, and Cooper is therefore entitled to the release date ordered by the Board.

III. The Record Before the Governor and Cooper's Due Process Rights

Cooper argues that the Governor's decision violated his due process rights because the record provided to the Governor was incomplete, inadequate, and misleading. He maintains that this deficient record, *923 which did not contain critical documents such as his Lifer Memo and the evidentiary portion of his 2006 hearing, denied him his right to a meaningful hearing.
Penal Code section 3041.2 states that, "when reviewing" the decision of the parole authority, the Governor "shall review materials provided by the parole authority." After examining the interpretation of "review" by courts in other jurisdictions, a California appellate court concluded, "`"review indicates simply a re-examination of proceedings already had" without the taking of any new evidence[,]'" and "[t]he Governor's review must satisfy minimum due process requirements." (In re Arafiles, supra, 6 Cal.App.4th at p. 1477, 8 Cal.Rptr.2d 492.) The court in In re Arafiles concluded that the "`review'" authorized by Article V, section 8, subdivision (b) of the California Constitution and section 3041.2 of the Penal Code "is confined to a reexamination and consideration of the administrative record before the [Board]." (Arafiles, at p. 1478, 8 Cal.Rptr.2d 492.)
The Governor's review must be of the same record that was before the Board. Although the Attorney General cannot verify exactly what documents were reviewed by the Governor, it appears that the entire record was not provided to the Governor.
The problems with the record presented to the Governor came to light after we granted Cooper's motion, which the Attorney General opposed, to compel production of the entire administrative record before the Governor. On May 9, 2007, the Attorney General in its letter to this court stated that it had "attached the entire administrative record used by the Governor to reverse petitioner's parole grant...."
Cooper's argument in his traverse asserted a due process violation claim because the record lodged by the Attorney General was missing critical documents. Cooper pointed out that much of the voluminous material in the record would have been useless to the Governor and would have required a significant amount of time to review. This voluminous record did not contain, among other documents, the evidentiary portion of the transcript of the 2006 Board hearing and the Lifer Memo. The Board had expressly recommended that the Lifer Memo be considered in any review of its decision. Additionally, although the record contained our first nonpublished decision reversing Cooper's conviction, it did not have our second nonpublished decision, which set forth and reviewed the evidence of the crime presented at trial.
As a result of the documents missing from what the Attorney General depicted as "the entire administrative record used by the Governor to reverse petitioner's parole grant," we issued an order on June 7, 2007, directing the Attorney General to respond to the problems with the record and any possible violation of Cooper's due process rights. The Attorney General filed its reply and stated that the five exhibits attached to its return to the order to show cause were part of the administrative record with the exception of the Governor's parole reversal letter. Although the Attorney General had previously represented that it was filing with this court the entire administrative record before the Governor, it now represented that "[n]o copy of the record provided to the Governor's office is kept. The record largely consists of the inmate's central file, and once the central file is returned to the prison, additional documents continue to be added...." Thus, according to the Attorney General, documents that were not part of the record before the Governor were added to the central file and included in the record lodged with this court.
*924 With regard to the documents missing from the record, the Attorney General maintained that the evidentiary portion of the 2006 parole hearing had been removed because it was already attached as an exhibit to the return. The Attorney General explained that it "did not deem it necessary to include an additional copy along with the later submission of the central file. Furthermore, the complete transcript is not in fact kept in the central file[,] ... only the decision pages of parole hearing transcripts are maintained in an inmate's central file."[4]
As for the Lifer Memo, the Attorney General conceded that it could not state "with absolute certainty" that this document was "part of the record before the Governor...."[5] The Attorney General maintains that other documents in the record serving as the basis of the Lifer Memo were in the record and therefore Cooper had a chance to be heard. However, since it was unclear that the Governor reviewed the Lifer Memo, the Attorney General recommended that we vacate the Governor's decision and permit the Governor to conduct another review in accordance with due process. (See In re Capistran (2003) 107 Cal.App.4th 1299, 1307, 132 Cal. Rptr.2d 872.)
The Attorney General's inability to verify the actual record presented to the Governor presents a serious due process problem. It is unclear whether the problems with this record are the responsibility of legal counsel at the correctional facility, Board of Parole Hearings staff, and/or the Attorney General. It is also not clear whether the inability to verify the actual record before the Governor is particular to this case or represents a more systemic problem. When no party can verify the actual record before the Governor and the complete record contains some evidence to support the denial of parole, the matter should be remanded to the Governor to conduct another review in accordance with due process. (See, e.g., In re Capistran, supra, 107 Cal.App.4th at pp. 1306-1307, 132 Cal.Rptr.2d 872 [Governor's decision to deny the prisoner parole on the basis of the nature of his offenses was supported by "some evidence," but appellate court vacated the Governor's decision and ordered the Governor to issue an order in accordance with due process because the Governor failed to mention the petition's institutional behavior or other facts demonstrating that he was suitable for parole at the time].)
In the present case, however, we have concluded that no evidence supported the Governor's finding that the crime was heinous or callous. The record establishes that Cooper does not pose an unreasonable risk to public safety and any contrary conclusion lacks any evidentiary support. We have the entire record that was before the Board and, as stressed above, the Governor's constitutional authority is limited to a review of the evidence presented to the *925 Board. (See, e.g., Smith I, supra, 109 Cal.App.4th at p. 507, 134 Cal.Rptr.2d 781.) Our review indicates that there is no evidence to support a decision other than the one reached by the Board and therefore a remand to the Governor in this case would "amount to an idle act." (Ibid.) Accordingly, we order that Cooper immediately be released on his parole.

DISPOSITION
The Governor's decision reversing the Board's grant of parole to Cooper is vacated. Cooper's petition for habeas corpus is granted. The Board is ordered to release Cooper pursuant to the conditions set forth in its decision of February 16, 2006, granting him parole and setting a release date. Considering that the minimum eligible parole date set by the Board was July 24, 2001, and in the interests of justice, this opinion shall be final as to this court immediately. (Cal. Rules of Court, rule 8.264(b)(3).)
KLINE, P.J., and RICHMAN, J., concur.
NOTES
[1] One of the commissioners at the 2004 parole hearing concluded: "And some of the answers that Mr. Cooper gave today regarding perhaps his insight, his level of remorse, in speaking about the victim and disposing of her body in the trunk of a car and leaving her at the airport, I found it rather lacking in insight and in being in control of the situation. And it was also noted that Mr. Cooper was married again while he was in prison and that marriage has dissolved. And I think there is a clear indication from body language and from statements that he still is a man that wants to be in total charge, and when he is not it is very uncomfortable with him. And this Panel does not understandis not comfortable with how this will work for him in a free society."
[2] All further unspecified section references and all further references to regulations are to title 15 of the California Code of Regulations.
[3] We express no opinion as to whether the record before the Governor should include any infraction or other exceptional circumstances occurring after the hearing before the Board.
[4] The Attorney General points to no evidence in this record that establishes the record before the Governor did include the evidentiary portion of the 2006 Board hearing. Rather, the Attorney General simply cites to statements by unnamed staff and asserts the following: "Board of Parole Hearings staff indicate [sic] that when the Governor reviews a parole decision, they ensure that a complete transcript of the parole hearing at issue is sent to the Governor's office, along with the Central File and the Executive Case Summary."
[5] The Attorney General maintains that unnamed "Board staff report [sic] that the [Lifer] [M]emorandum's inclusion in the Executive Case Summary indicates that the Board of Parole Hearings had a copy in its possession, and the regular course of business would have been to send it to the Governor to aid him in his review."